## BALTIMORE & O. R. CO. v. CAMP.

(Circuit Court of Appeals, Sixth Circuit. February 5, 1895.)

### No. 194.

1. EVIDENCE—NEGLIGENCE.

In an action against a railroad company for personal injuries resulting from the negligence of a telegraph operator in its employ, one of the

Issues was as to the negligence of the company in employing such operator, when he was known to be incompetent and careless, or when his incompetency and carelessness might, with reasonable diligence, have been ascertained. *Held,* that it was competent to show that such operator had been suspended a few months before for going to sleep while on duty, and also to show what the operator's experience had been with other railroads.

**2. FELLOW-SERVANTS—TRAIN DISPATCHER AND ENGINEER.**

A train dispatcher, who has complete control of the movements of all trains on a division of a railroad, is not a fellow servant of the engineer of a train running on such division, either at common law, or under the statute (Act April 2, 1890, § 3) of Ohio providing that every person in the employ of a railroad company, actually having power or authority to direct or control any other employé, is not a fellow servant, but a superior, of such other employé.

**3. SAME—TELEGRAPH OPERATOR AND ENGINEER.**

A telegraph operator at a station on the line of a railroad, whose duty it is to receive telegraphic orders relative to the movements of trains from the train dispatcher at another place, and communicate them to the engineers and conductors of trains at his station, is not the superior, but the fellow servant, of the engineer of a train on such railroad, both at common law and under the statute (Act April 2, 1890, § 3) of Ohio.

In Error to the Circuit Court of the United States for the Eastern Division of the Southern District of Ohio.

This was an action by John P. Camp against the Baltimore & Ohio Railroad Company to recover damages for personal injuries. On the trial in the circuit court a verdict and judgment were given for the plaintiff. Defendant brings error.

John P. Camp, while engaged as a locomotive engineer of the Baltimore & Ohio Railroad Company, was seriously injured in a collision between two of its freight trains at a point about six miles east of Black Hand Station, on its Central Ohio Division. He brought his action in the Licking county, Ohio, common pleas court, against the company, for damages; and the company, which is a citizen of Maryland, removed the case to the court below, where, after a trial, verdict and judgment were rendered in plaintiff's favor, and against the company, for $10,000. This is a proceeding in error to review that judgment.

The Central Ohio Division of the Baltimore & Ohio Railroad Company extends from Newark, through Zanesville, to Bellaire. The only telegraph station between Newark and Bellaire is Black Hand, which is about 10 miles east of Newark and 15 miles west of Zanesville. Camp's engine was No. 999, and at the time of the collision was drawing the first section of east-bound train No. 28. The west-bound train in the collision was No. 23. No. 28 was a daily east-bound freight train, due to leave Newark at 9:15 p. m. No. 23 was a west-bound freight train, due to arrive at Newark at 5:38 p. m. Train No. 47 was a west-bound express passenger train, due to arrive at Newark at 7:15 p. m. On the evening of the collision, trains No. 47 and No. 23 were several hours late. Camp, as engineer, and his conductor, were directed to wait at Newark until the arrival of No. 47, and then to run as the engine of the first section of train No. 28, and to carry green signals, indicating that a train was following from Newark to Bellaire. This was order No. 1,275, to the conductor and engineer of No. 28, at Newark. The freight train waited at Newark some distance from the station, until train No. 47 came in, somewhere between 10:45 and 10:50. About the time of the arrival of train No. 47, and the departure from the freight yard at Newark of Camp's train, No. 28, the train dispatcher sent dispatch No. 1,285 to the engineers and conductors of the four sections of train No. 23, which was then at Zanesville. The dispatch was as follows: "First 28, engine 999, and first, second, third, and fourth of 23, engines 986, 962, 988, and 983, will meet at Black Hand." This was received by the operator at Black Hand, and acknowledged by him, as it was also by the operator at Zanesville, and the conductors and engineers

of train 23 at Zanesville, but it was not handed to or received by the conductor and engineer of train No. 28. There is some conflict in the evidence as to whether, at the time the dispatch was sent out, it might not have been delivered to the conductor and engineer of train 28 in the Newark yard. At the same time a dispatch was sent to the operator at Black Hand (No. 1,286), of this character: "Hold first and second 28 for orders." The receipt of this was acknowledged by the operator, Keelty, at Black Hand. Train No. 28 reached Black Hand at 11:31, where it took water, and then whistled for the target, which was displaying a red light. The operator at Black Hand looked about to see whether he had any orders for train No. 28, and negligently overlooked the two orders which he had received an hour before, to hold 28 for orders, and the direction that 28 and 23 would meet at Black Hand. Not finding any orders, he withdrew the red signal, and gave the white light, which was an indication to the engineer that there were no orders for him. It therefore became his duty, under his running order, to proceed to Bellaire, because, so far as he was informed, the track was clear. This was in accordance, too, with the general running rule, A, which provided that regular trains moving east have absolute right of track over regular trains moving west, of same or inferior class. Train No. 23 left Zanesville for Black Hand at 11:15 p. m. The collision occurred about 12 o'clock, six miles east of Black Hand. Camp was caught between the wheels and the boiler, had one foot burned off, so that the leg had to be amputated, and was otherwise injured.

Rule 225 of the regulations of the defendant company provides as follows: "Safety demands that all persons connected with the movement of trains by telegraph should use the utmost care and watchfulness. All rules regarding the same must be strictly observed. Orders must be plain and explicit, and not too long. If not fully understood by those to whom addressed, an explanation will be required before signing them."

Rule 226 of the defendant company governs the issuing of train orders by telegraph, and provides as follows: "All special orders, by telegraph or otherwise, for the movement of trains, will be given in writing, with the date on which they were sent, and addressed to the conductors and enginemen of each particular section of the trains for which they are intended. They shall be written in full, without abbreviations, except such as are provided for herein."

Rule 227: "Orders shall be sent and signed by the superintendent, or for him by train dispatchers appointed for that purpose. When issued by train dispatcher, he will add his initial letter to those of superintendent."

Rule 228: "Only one person at a time will be allowed to move trains by telegraph on any division or subdivision."

Rule 257: "When a meeting point is to be made between two trains at a certain station, the orders should be sent to said trains to stations on either side of the actual meeting point, and never, when it can possibly be avoided, to said meeting point itself. Should it, however, at any time, be absolutely necessary to send the orders to the actual meeting point, the train dispatcher must see that special precautions are adopted to secure safety, by sending out flagmen, or otherwise, at said meeting point, as the circumstances may require."

Rule 261: "All train dispatchers or others who may move trains by special order are cautioned to use the utmost care in all their work. Do not let your anxiety to hasten the movement of trains induce you to take any risks. When you change off with each other, take great pains to make sure that the man who is about to assume charge fully understands the position of trains, and the character of their orders. In all cases, give him a full, written statement, showing the exact situation."

Rule 264: "An order to be sent to two or more offices must be transmitted simultaneously to as many as practicable. The several addresses must be in the order of superiority of rights of trains, and each office will take only its proper address. When not sent simultaneously to all, the order must be sent first for the train having the superior right of track."

Rule 265: "When an order has been transmitted, preceded by the signal '31,' operators receiving it must, unless otherwise directed, repeat it back at once from the manifold copy, and in the succession in which their several

offices have been addressed. Each operator repeating must observe whether the others repeat correctly. After the order has been repeated correctly by the operators required at the time to repeat it, the response, 'O. K.,' authorized by the train dispatcher, will be sent simultaneously to as many as practicable, naming each office. Each operator must write this on the order at the time, and then reply, 'i i O. K.,' with his individual and office signal. Those to whom the order is addressed must then sign their names to the copy of the order to be retained by the operator, and he will send their signatures to the superintendent. The response, 'Complete,' the exact time, and the superintendent's initials will then be given, when authorized by the train dispatcher. Each operator receiving this response will then write on each copy the word 'Complete,' the time, and his last name in full, and will then deliver a copy to each person included in the address, and each must read his copy aloud to the operator."

Rule 266: "For an order preceded by the signal '31,' 'Complete' must not be given to the order for delivery to a train of inferior right until 'O. K.' has been given to and acknowledged by the operator who receives the order for the train of superior right. The signature of the conductor, engineman, and pilot of the train of superior right must be taken to the order, and 'Complete' given before the train of inferior right is allowed to act on it: provided, however, in cases of great emergency, and the conditions favorable, a train of a superior right can be held through the agent and operator, and one or more reliable employés. In addition thereto, torpedoes must be placed on the rail, and the dispatcher notified that the torpedoes are thus placed, and all signals out. This notice to the dispatcher that torpedoes and signals are out must be made as follows: 'There is one torpedo on each rail, and all holding signals are out.' No letter or character will be allowed to communicate the above.

"After 'O. K.' has been given and acknowledged, and before 'Complete' has been given, the order must be treated as a holding order for the train addressed, but must not be otherwise acted on until 'Complete' has been given.

"It must be understood, in explanation of the foregoing paragraph, that after 'O. K.' has been given and acknowledged the train is held for orders, but will not use the order until 'Complete' is given. In other words, the inferior train will not be moved against the superior train until 'Complete' is given the superior train."

In this case, if rule 257 had been followed, train No. 28 would have received orders to stop at Black Hand before leaving Newark, as train No. 23 received orders at Zanesville to stop at Black Hand. In this case, however, the orders were sent to the actual meeting point, but the train dispatcher did not see that special precautions were adopted to procure safety, by sending out flagmen, or otherwise, at the meeting point. Train No. 28, by the rules of the company, running east, had superior right over train No. 23, of the same class, going west. By virtue of rule 266, the order to stop at Black Hand should first have been received by train No. 28, and should have been made complete by the officers of that train before train 23 was allowed to act on it. The rule, however, has the exception that in case of great emergencies, and in favorable conditions, train 28 could be held through the agent and operator, and one or more reliable employés, by whom torpedoes should be placed on the track, and the dispatcher should be notified that the torpedoes are thus placed, and all signals out. But in such a case the inferior train is not to be moved against the superior train until the officers of the superior train have been notified, and "Complete" marked on their dispatch. There was some evidence tending to show that it had been the custom not to live rigidly up to the rules, in this respect, and that Camp had acted on similar orders before without the precautions enjoined by the rules. The operator at Black Hand, whose name was Keelty, was a boy of 18 years of age, and, some 10 months before the collision, had been employed by the railroad company, and, after 4 months' service as night operator at Glencoe station, was suspended indefinitely for going to sleep, because he stopped a fast express train, and did not give it the white signal in response to its whistle. He was then off for 10 days, and was again appointed by Kimball, the division general operator, who had the authority to hire telegraph operators for the railway company, and was employed again by the same person for day

work at Glencoe. He was then discharged as day operator for quarreling with an employé. He then applied for work on the Pan Handle road, and was examined as telegraph operator by the officers of that road. He did not get his certificate, because of a defect in his left eye, and was discharged after three weeks' employment by that company. He was then employed by the Cleveland, Canton & Southern Railroad Company, but had trouble with the train dispatcher, and was discharged. He was then again re-employed by Kimball for the Baltimore & Ohio Company, and worked two nights at Utica, on that road. He was then called by telegram from Kimball to Newark, who sent him from there to Black Hand to do night work. He reached Black Hand at 1 o'clock in the afternoon of the 27th of September, and the collision occurred that night. When Kimball sent Keelty to Glencoe, a month before the collision, he told him "to stay awake and attend to his business," or something like that. Kimball testified that he had put Keelty through an examination, and determined that he was a competent and safe man to handle train work,' though he said nothing to contradict the facts above stated.

The averment of the petition was as follows: "That said collision and injury was caused by the carelessness and negligence of said telegraph operator at Black Hand, whose name is Keelty, in failing to notify said plaintiff and the conductor of the first section of train 28 to stop at Black Hand, and in failing to stop said train 28 at that point, and also by the carelessness and negligence of the officers and agents aforesaid of the defendant [referring to superintendent, train master, or train dispatcher], in failing to give said plaintiff any notice or order to wait at Black Hand for train 23, and meet said train 23 at that point, and in failing to have train 28 stopped at Black Hand; and also by the carelessness and negligence of said officers and agents aforesaid in appointing a meeting point for said trains at said time and place, and in failing to give proper notice to the conductors and engineers of said trains, thereof, and in ordering and permitting said train 23 to leave Zanesville to run westward to Black Hand to meet train 28. And plaintiff further avers that said defendant negligently and carelessly employed and kept in its employment at said time, as such telegraph operator at Black Hand, said Keelty; being then and there a careless, negligent, inexperienced, incompetent person, and wholly unfit for the position of telegraph operator at that point."

At the close of the evidence the defendant requested the court to charge the jury as follows: "Upon the pleadings and the testimony in this case, the plaintiff is not entitled to a verdict, and you will therefore return a verdict for the defendant." Second. "The plaintiff, John P. Camp, and the telegraph operator at Black Hand, Francis T. Keelty, were at the time of this accident fellow servants of a common master; and the plaintiff cannot recover in this case for any negligence of the said telegraph operator, producing the collision in which the plaintiff received the injuries complained of in this case." Third. "The train dispatcher, Baird, who made the order over the initial signature of the superintendent of the road for the movement of these trains which collided, and which produced the injury complained of in this case, and the plaintiff, John P. Camp, were, at the time of this accident, fellow servants of a common master; and the plaintiff cannot recover in this case by reason of any negligence of the said train dispatcher." These three charges the court refused to give, and the defendant excepted. Parts of the charge which the court did give, to which the defendant objected and excepted, are as follows: "Now, if Keelty at that time occupied such a position under the defendant company that he could direct or control Camp, or direct and control the men on that train, then he was not, under this statute, the fellow servant of Camp, but his superior,—the representative of the company; and the company is responsible for whatever injury was caused by his negligence, or failure to do his duty." "The order to train No. 23 was to proceed westward. The order to the operator at Black Hand was to detain No. 28, and that No. 23 would meet and pass at that point. The testimony is that upon that order it was the duty of the operator at Black Hand to display the red light. The result of so doing would be, according to all the testimony in the case, to stop train No. 28. That train could not pass that station (I mean if the conductor and the engineer obeyed the rules of the company) so long as the red light was displayed. Whether Keelty had power

to direct the train has been argued upon the question what was the effect of changing the red light to the white light, but I think that does not go back far enough. His duty under that order was to display the red light, and keep it displayed. According to all the evidence, that was a stop order, and would have had the effect to stop the train. Indeed, the witness called (Mr. Costello) from the Hocking Valley road, when put upon the stand for the defense, testified that the order sent to Black Hand was just as good as a 'do not' order, or as an order, in terms, to stop and wait for orders, because it would effect the same purpose. How? Because it required Keelty to hold the train. Now, I can see no escape from the conclusion that Keelty was vested with the authority, and that he had the power, to direct train No. 28 in that respect. And if he had either the power without the authority, the actual power, or had the authority, or if he had both, the case, in my judgment, and I so charge you, comes within the operation of the third section of the act of April 2, 1890; and Keelty was the superior officer, and the company is responsible for Keelty's neglect. Therefore, gentlemen, if you find the fact to be as it is claimed for the plaintiff, I say to you, as a matter of law, that Keelty was not the fellow servant of Camp. He was his superior, and the company is responsible for any damages resulting."

The act of April 2, 1890, referred to by the court in the preceding charge, was an act, the title to which reads as follows: "For the protection and relief of railroad employés; forbidding certain rules, regulations, contracts and agreements, and declaring them unlawful; declaring it unlawful to use cars or locomotives which are defective, or defective machinery or attachments thereto belonging, and declaring such corporation liable in certain cases, for injuries received by its servants and employés on account of the carelessness or negligence of a fellow servant or employé." The first section makes it unlawful for any railroad company to require any of its employés to agree in advance to hold the corporation harmless for any injury he may sustain, which he otherwise might recover damages for from the company. It forbids the company to require any employé to contribute any part of his wages to an association. It gives him the right, if discharged, to require within 10 days a reason from the company for his discharge, and provides a penalty for the violation of the section. Section 2 makes it unlawful for any corporation knowingly or negligently to use any defective car or locomotive, and provides that, if the employé of such company shall receive any injury on account of it, it shall be prima facie evidence of negligence on the part of the corporation. Section 3, which is the one referred to by the court above, is as follows: "That in all actions against the railroad company for personal injury to, or death resulting from personal injury, of any person, while in the employ of such company, arising from the negligence of such company or any of its officers or employés, it shall be held in addition to the liability now existing by law, that every person in the employ of such company, actually having power or authority to direct or control any other employé of such company, is not the fellow servant, but superior of such other employé, also that every person in the employ of such company, having charge or control of employés in any separate branch or department, shall be held to be the superior and not fellow servant of employés in any other branch or department who have no power to direct or control in the branch or department in which they are employed."

J. H. Collins, for plaintiff in error.

R. A. Harrison (S. M. Hunter, of counsel), for defendant in error.

Before TAFT and LURTON, Circuit Judges, and SEVERENS, District Judge.

TAFT, Circuit Judge, after stating the case as above, delivered the opinion of the court.

Error is assigned to the ruling of the court below in permitting an answer to this question which was put to Keelty, the operator whose negligence caused the collision, "Why were you suspended indefinitely (that is, before the collision)?" Answer: "I went to

sleep, and stopped a fast train, No. 6." The question and answer were plainly relevant. The petition charged that the defendant company was guilty of negligence in the employment of Keelty, through whose gross neglect of duty the collision occurred, because he was careless, negligent, incompetent, and unfit for duty. The petition does not expressly charge that this negligence of the company caused the accident, but it was evidently inserted in the petition for this purpose. The case below was tried on that as one of the issues, and after a verdict and judgment it is too late to say that the petition is inartificially drawn. The fact that this operator, only a few months before, while on night duty, had gone to sleep, and had thereby stopped a train, which it was his duty to allow to pass, was most significant evidence upon the issue whether the company had been careless or not in his re-employment.

The second assignment of error is that the court refused to charge the jury to return a verdict for the defendant. In this the court was clearly right. Without respect to the question whether Keelty, the telegraph operator, could be considered the superior of Camp, the engineer, under section 3 of the act of 1890, above quoted, there were two other issues upon which the case must have been submitted to the jury. The first was whether the company had been negligent in the re-employment of Keelty as night operator at Black Hand. The highly-responsible character of the duties of a night telegraph operator at a station upon a trunk-line railroad is too obvious to need much comment. The great degree of care, therefore, which the company must use in the selection of such agents, is also plain. Fidelity, watchfulness, ability to stay awake, promptness, knowledge of telegraphy, and a proper sense of responsibility, should all be present in such an agent, and the obligation upon the company to make proper inquiries concerning the presence or absence of these qualities in the person to be selected for the position must certainly be recognized by courts and juries alike. It has been emphatically recognized by the supreme court of the United States in the opinion delivered for that court by Mr. Justice Harlan in the case of Railway Co. v. McDaniels, 107 U. S. 454, 2 Sup. Ct. 932. The trial court in that case charged that the position of a telegraph night operator upon a line of road was one of great responsibility, the lives of passengers and employés of trains depending on his skill and fidelity; that the company was under duty to exercise "proper and great care" to select competent persons for that branch of its service; and that the defendant was chargeable with notice of all facts concerning the fitness of such employés, which by reasonable diligence they might have known. This charge was objected to because the court used the expression "proper and great care," instead of "ordinary care," and for other reasons. The supreme court held that the objections were not well taken. It follows from this case that it was competent for the plaintiff to show the entire record of Keelty as a telegraph operator, whether the facts were actually known to the defendant company or not, because if they were facts of such a character that the de-

fendant company might, by reasonable diligence, have known them (which was a question for the jury), then it ought to have known them. We therefore think that it was competent to show what Keelty's experience had been with the Pennsylvania Company and other railroads, because it was for the jury to say whether such facts might not have been known by the Baltimore & Ohio Railroad Company, had they made proper inquiry. We are convinced, from an examination of the evidence, that it was ample for submission to the jury upon the issue whether the company had not been negligent in continuing Keelty in their employ as a night operator, —a boy of 18 years of age,—who, within a few months before the accident, had gone to sleep on duty. A verdict based on such evidence against a railway company, and the other circumstances here shown, a court would not be justified in setting aside.

Another issue which it was the duty of the court below to submit to the jury was the question whether the train dispatcher had not been guilty of negligence in the orders which he gave for the movements of the two colliding trains, No. 28 and No. 23. The train dispatcher, by the evidence in this case, had complete control for eight hours of the movement of all trains. He sent his dispatches in the name of, and in the stead of, the superintendent, who was absent from the office, and he was therefore at the head of the division for the operation of trains. It needs no argument to show that he was the superior of the engineer and conductor of train No. 28, within the third section of the act of April 2, 1890, quoted above, and that under that act the railroad company was liable for his negligence. More than this, we do not doubt that a train dispatcher is a representative of the company, within the rule of the common law, as expounded by the supreme court of the United States in the case of Railroad Co. v. Baugh, 149 U. S. 369, 13 Sup. Ct. 914. He represents the company for two reasons—First, because he is pro tempore in supreme control of a distinct department of the railroad, namely, the running department of the company for his division; and, second, because the work which he is called upon to do is in the discharge of a positive duty owed by the company to its employés. By the train dispatcher's authority to sign the superintendent's name to his telegraphic orders which control the operating department of his division, he becomes the superintending officer of his division; and as was said by Mr. Justice Field in the Ross Case (5 Sup. Ct. 184), of the conductor, unless he is the representative of the company it has no representative in charge of the operation of trains.

Again the railway company is bound to provide general rules and general time-tables for the reasonably safe operation of its railway system, and also rules applicable to all emergencies likely to arise. It is inevitable that at times, and in sudden exigencies, the general time-table must be set aside. It then becomes the duty of the company to construct a temporary time-table with such care and skill that it may be reasonably adapted to secure the operation of all the trains on the road without accident or injury to passenger or employé. The person who devises this

temporary time-table for the company, and issues telegraphic orders to carry it out, is the train dispatcher. He acts, it is true, under certain rules, but he is intrusted with a wide discretion and absolute control. That he is the representative of the company, and not the fellow servant of those required to obey his orders, is held by many courts. Hankins v. Railroad Co., 142 N. Y. 416, 37 N. E. 466; Dana v. Railroad Co., 92 N. Y. 639; Sheehan v. Railroad Co., 91 N. Y. 342; Slater v. Jewett, 85 N. Y. 62; Darrigan v. Railroad Co., 52 Conn. 285; Lewis v. Seifert, 116 Pa. St. 628, 11 Atl. 514; Hunn v. Railroad Co., 78 Mich. 513, 44 N. W. 502; Railroad Co. v. Barry, 58 Ark. 198, 23 S. W. 1097; Railroad Co. v. McLallan, 84 Ill. 109; Smith v. Railroad Co., 92 Mo. 359, 4 S. W. 129; Washburn v. Railroad Co., 3 Head (Tenn.) 638; Railroad Co. v. Arispe, 5 Tex. Civ. App. 611, 23 S. W. 928, and 24 S. W. 33; McKin. Fel. Serv. § 143.

In this case the rules of the company were certainly ample to secure safety in the movement of trains under telegraphic orders. Dispatches were required to be sent to trains which were to meet, so as to reach each train one station away from the meeting point. The receipt of these dispatches was to be acknowledged by the operator and those in charge of the trains affected thereby, before the orders were acted on. The east-bound train had, by the rules of the company, the right of way, and the west-bound train was not to leave, under the orders sent, until the officers of the east-bound train had signified their understanding of the orders to the train dispatcher. In case of great emergency, it was permitted that trains should meet at a point without having received directions so to do at previous stations, but in such cases the train dispatcher was required to see to it, by communication with the operator at the proposed meeting point, that extra precautions, by torpedoes and flagmen, had been taken to stop the trains. It does not appear why it was necessary to delay sending out the dispatch for the meeting of train 23 and train 28 until the latter train had left Newark, if, indeed, it had then done so. There was a conflict as to whether, when the dispatch was sent, it might have been delivered to train 28 at Newark. Indeed, there was little or no evidence before the jury to show the emergency which justified a departure from the ordinary rule in this case. But, even if there were, certainly no attempt was made to show why the train dispatcher had not, in accordance with the rules, insisted on receiving from the operator at Black Hand assurance that the extra precautions required by the rules—namely, the display of holding signals and the use of torpedoes—had been taken. Had he done so, the collision would not have occurred. All these circumstances were for the consideration of the jury on the issue whether the company was reasonably prudent and careful in the management of its trains; its own rules furnishing competent evidence, as against itself, of a proper standard of care. The long acquiescence of the engineer in a departure from such rules without objection, if anything of the kind were shown, would be competent to prove an assumption of the additional risk thereby involved, and defeat an

action for injury caused thereby; but a compliance with an exceptional order varying from the rule, suddenly made, would not constitute such acquiescence. On the whole case, we are clearly of opinion that the evidence of negligence in the train dispatcher's orders was quite enough to support a verdict for defendant.

The third and fifth assignments of error present the question whether, either under the statute of Ohio or at common law, the plaintiff. Camp, as engineman, and Keelty, the telegraph operator, were fellow servants. The circuit court held that they were not fellow servants, by virtue of the Ohio statute. We are not able to concur in this construction of the statute. In our opinion the telegraph operator has neither power nor authority to direct or control the engineer. He is only the medium through whom orders from the train dispatcher are communicated to the engineer and the conductor. He gives notice to the engineer and the conductor. He gives notice to the engineer of certain facts, from which the duty of the engineer arises, under the rules of the company. The conductor is in control of the train, and the engineer and the brakeman are his subordinates. Suppose that the conductor sends an order to the engineer by the brakeman. Does the brakeman thereby become a person actually having power or authority to direct or control the engineer? Manifestly not. When a switchman throws a switch, and signals to the engineer that he has done so, is he actually exercising power or authority to direct or control the engineer? Clearly not. The duty of the switchman, in such a case, is merely to give notice to the engineer of the condition of affairs upon which the engineer is required to act. And so the engineer's duty to act upon the signal from the telegraph operator does not come from any authority or power to control reposed in the telegraph operator. The authority or control is in the train dispatcher, who gives the order, not in the mere transmitter of it. When there is no order, but the telegraph operator conveys by signal, to the engineer, information as to the position of other trains, or the condition of the track ahead, the operator is the mere register of the fact; a mere notifier; a mere giver of information, upon which the engineer, under the rules of the company, at once knows his duty, and acts accordingly. In Railway Co. v. Ranney, 37 Ohio St. 665 (decided before the act of 1890 became the law), the question was whether an engineer, who gave signals by whistles, to the brakeman, to put on and release brakes, exercised a power to control and direct the brakeman in the performance of his duties. Judge McIlvaine (page 671), referring to this argument, says:

"It is contended that these signals are in the nature of orders or commands, which the engineer is authorized to give to brakemen, which they are bound to obey, and hence the relation of superior and subordinate is created. A majority of the court do not so understand either the purpose or effect of the rule. These signals are so named properly, and are intended to notify all concerned of the thing signified. They are addressed to the conductor as well as brakeman, and it is the duty of the conductor to see that brakemen perform the duty signified. This duty is imposed upon the brakemen by force of the rule itself, and not by virtue of any authority vested in the engineer over the brakemen. The signal is a mere notice,

The rule is the order of the company to the brakeman, directly. Suppose a train is signaled by a station agent, as this train was, to stop for orders. It thereby became the duty of the conductor, as well as of each employé on the train, to stop for orders; and yet no one can contend that such station agent who gives the signal is the superior, and the train crew subordinate employés of the company, within the meaning of the rule under consideration. A variety of signals, under a variety of circumstances, are required to be given by different employés of the company, to signify that an occasion exists for the performance of a particular duty; but it would be absurd to hold that in each case the employé giving the signal is a superior servant, to whom all others to whom information is thus communicated are subordinated, so that the company would be responsible to them for any act of negligence of the employé who gave the signal, whether such negligence was in giving the signal, or in the performance of other duties."

The same rule was laid down in the case of Railway Co. v. Lewis, 33 Ohio St. 196.

There is much less ground for holding that a telegraph operator has any control or authority over an engineer or a conductor than there is that the engineer has control over a brakeman.  The engineer exercises discretion to determine when the brakes shall be put on, and when not.  Knowing that his signals are to be acted on by the brakeman, and having discretion to give them as he thinks it proper, in the running of the train, he may, with some plausibility, be said to exercise actual power and authority over the brakeman, though, under the decision of the supreme court of Ohio, as we have seen, this is not the proper view.  But a telegraph operator, in giving notice to an engineer of a train about to pass, has no discretion whatever.  He gives the exact notice which the train dispatcher orders him to give, and no other.  He exercises no discretion.  He is a mere messenger boy.  He is the vehicle by which the order is carried.

But it is said that, while this might otherwise be a reasonable and proper construction of the statute, there is a clause in section 3 which imposes upon the court the duty of giving to the words, "actually having power or authority to direct and control," a meaning they do not usually have.  The important words of section 3 are:

"It shall be held in addition to the liability now existing by law, that every person in the employ of such company, actually having power or authority to direct or control any other employé of such company, is not the fellow servant, but superior of such other employé, also that every person in the employ of such company having charge or control of employés in any separate branch or department, shall be held to be the superior and not fellow servants of employés in any other branch or department who have no power to direct or control in the branch or department in which they are employed."

The argument is that because, by the decisions of the supreme court of Ohio previous to the passage of this act, where one employé actually had power or authority to direct or control another employé, the two were not fellow servants, and the master was liable for the negligence of the superior, therefore the court must now strain the meaning of the words, "actually having power or authority to direct or control," so as to give them a wider effect than the then prevailing rule of liability, and so satisfy the legislative

intent expressed in the words, "in addition to the liability now existing by law." From this necessity for a strained construction, the court is urged to hold that mere mediums of communicating orders, mere signal givers, mere registers of facts, exercise actual power and authority to direct and control the persons to whom it is merely their duty to communicate information or orders issued by others. It is true that, in the construction of a statute, it is the duty of the court, when it can, to give effect and meaning to every clause and part of it. It is also true that, before the passage of the act, it was uniformly held by state courts of Ohio that any person in the employ of a railroad company or other master, actually having power or authority to direct or control any other employé of the same master, was his superior, and that the master was liable for injury to the inferior caused by the negligence of such superior. This has been the holding since the decision of Railroad Co. v. Stevens, 20 Ohio, 415, as will be seen by reference to the following cases: Railroad Co. v. Keary, 3 Ohio St. 201; Railroad Co. v. Barber, 5 Ohio St. 541; Whaalen v Railroad Co., 8 Ohio St. 249; Manville v. Railroad Co., 11 Ohio St. 417; Railway Co. v. Devinney, 17 Ohio St. 197; Stone Co. v. Kraft, 31 Ohio St. 287; Railway Co. v. Lewis, 33 Ohio St. 196; Railway Co. v. Lavalley, 36 Ohio St. 221; Railway Co. v. Ranney, 37 Ohio St. 665; Dick v. Railroad Co., 38 Ohio St. 389; Railway Co. v. Spangler, 44 Ohio St. 471, 8 N. E. 467; Alexander v. Pennsylvania Co., 48 Ohio St. 623, 631, 30 N. E. 69. But the words, "in addition to the liability now existing by law," can have no effect to pervert the ordinary meaning of language. Courts are not compelled to stultify themselves for the purpose of reconciling inexplicable inconsistencies of legislatures; nor in this case is it necessary for the court to do so. The second provision in section 3, namely, that the superior in one branch or department shall not be the fellow servant of a subordinate in another branch, does add to the liability of the railway companies under the decisions of the Ohio courts, as they were at the time of the passage of this act. In Railway Co. v. Devinney, 17 Ohio St. 197, it was held that a company was not liable to a brakeman on one of its trains, for injuries sustained by him in a collision occurring by reason of the negligence of the conductor of the other train, because such conductor and brakeman were fellow servants. And this was the holding until was passed the statute now under investigation, whereby the company becomes liable to the brakeman for injury by the negligence of the conductor or engineer of another train. Railroad Co. v. Margrat (a decision by the supreme court of Ohio) 37 N. E. 11. The words, "in addition to the liability now existing by law," therefore, may be given effect by referring them to this latter provision of the section. Taking the parts of the section together, it would seem that the first clause was introduced as merely declaratory of the law then existing, for the purpose of making fuller and clearer the meaning of the legislature with reference to the second clause. In commenting on the first clause, and the alleged implication in the statute that it increased the liability of railroad companies, Judge Bradbury, in delivering the opinion in Railroad Co. v. Margrat, said:

"The remedy was so complete, where the relation of superior and subordinate actually existed, that the statute here could have little or no operation. Still it may be said that the statute makes the rules of liability of certain and universal application, denying any exception to its operation, wherever the relation of subordinate and superior exist, and the subordinate is injured by the negligence of the superior while engaged in the common service."

There is no suggestion in this by the court that the words, "actually having power and authority to direct or control," do not describe a relation in which one is the "superior" and the other the "subordinate," within the ordinary meaning of those terms. It seems too plain for further argument that the conductor and the engineer are not subordinates of the telegraph operator, within the statute.

Second, it is argued that, even if this be true, the telegraph operator is nevertheless not a fellow servant of the conductor and engineer, within the common-law rule. We think he is. He and the engineer and the conductor work together, at the same time and place, for a common employer, with an immediate common object, namely, the proper running of trains. It is essential, in the operating department of a railroad company, that there should be provision for communicating to those in charge of different trains the whereabouts of other trains, to avoid collision. This information is given by means of the general time-table and general rules for the running of trains with reference to each other, which the employés in charge of each train are obliged implicitly to obey. But it often happens that the general time-table must be varied from, and these variations must be communicated to those in charge of trains. This is effected usually by telegraphic orders from the superintendent or the train dispatcher, who has supreme control of the running of trains. The information is also communicated by means of flagmen, by means of torpedoes, by red lights and green lights upon trains, by the block-signal system, and in other ways. The subordinate employés, whose duty it is to transmit the orders of the officer in control, or to give information as to the presence of trains upon any part of the track, without special orders, are engaged at the same time and place with the persons operating the train, in a common employment, having an immediate, common object, namely, that of the running of trains, and therefore are fellow servants. The man who makes the signal at the station to the engineer on the approaching train to stop is as much engaged in the running and operation of that train as the flagman sent out ahead to signal the condition of a switch. Neither exercises the discretion or the judgment or the control of the master, but each contributes his part to the safe running of the train. There can be no separation of the signal department and the operating department, for the employés engaged upon the train, in the actual, manual operation of the train, are expected to be part of the signal department of the company. The man who puts out the green light at the back of the train, to indicate that a train is following, communicates to every station agent, every conductor, and every engineer, who sees it, knowledge upon which they, each of them,

must act, and yet it can hardly be said that the brakeman, in displaying this green light, is acting in a different department from the man who opens and closes the throttle valve of the engine. The principles which must govern in this case were first announced by the supreme court of the United States in Randall v. Railroad Co., 109 U. S. 478, 3 Sup. Ct. 322. In that case a brakeman working a switch for his train on one track in the railroad yard was injured by the negligence of the engineman of another train, in driving his engine too fast, and in not giving due notice of its approach. It was held that the two were fellow servants. Said Mr. Justice Gray, delivering the opinion of the court:

"They are employed and paid by the same master. The duties of the two bring them to work at the same place at the same time, so that the negligence of the one in doing his work may injure the other in doing his work. Their separate services have an immediate, common object in the moving of the trains. Neither works under the orders or control of the other. Each, by entering into his contract of service, takes the risk of the negligence of the other in performing his service; and neither can maintain an action for an injury caused by such negligence against the corporation, their common master."

Every word of this passage has application to the relation existing between the engineman of a train and a telegraph operator charged with the duty of signaling the engineman. Among the cases cited by Mr. Justice Gray is that of Slater v. Jewett, 85 N. Y. 62, where it was expressly held by the court of appeals of New York that a telegraph operator and a fireman upon an engine were fellow servants, so that the fireman could not hold the railway company liable for an injury caused by the negligence of the telegraph operator in transmitting a dispatch giving orders to the engineer.

In Steamship Co. v. Merchant, 133 U. S. 375, 10 Sup. Ct. 397, the stewardess of the steamship was injured by leaning against the rail, which had not been properly replaced by the porter and carpenter of the ship, who had had occasion to remove it and put it back. The contention was that the carpenter was in the deck department, and that the stewardess was in the steward's department, and that, therefore, neither was the fellow servant of the other; but the supreme court refused to take this view, and held that they were fellow servants. Said Mr. Justice Blatchford:

"The carpenter had no authority over the plaintiff, nor had the porter. They and the plaintiff had all signed the shipping articles; and the division into departments was one evidently for the convenience of administration on the vessel, and did not have the effect of causing the porter and the carpenter not to be fellow servants. * * * There was nothing in the employment or service of the carpenter or the porter which made either of them any more the representative of the defendant than the employment and service of the stewardess made her such representative."

The latest case on the subject is that of Railroad Co. v. Hambly, 154 U. S. 349, 14 Sup. Ct. 983, in which it was held that a common day laborer in the employ of a railroad company, while working for the company under the order and direction of a section boss or foreman, on a culvert of the line of the company's road, was a fellow servant of the conductor and engineer of a passenger train, and

,could not reco,ver of the company for an injury·sustained through
the negligence of such conductor and engineer.    After referring to
the case of Railway Co. v. Ross, 112 U. S. 377, 5 Sup. Ct. 184, and
Railroad Co. v. Baugh, 149 U. S. 368, 13 Sup. Ct. 914, Mr. Justice
Brown, speaking for the court, said:

"Neither of these cases, however, is applicable here, since they involved the
question of 'subordination' of fellow servants, and not of 'different depart-
ments.'  Of both classes of cases, however, the same observation may be
made, viz. that to hold the principal liable whenever there are gradations of
rank between the person receiving and the person causing the injury, or when-
ever they are employed in different departments of the same general service,
would result in frittering away the whole doctrine of fellow service.  Cases
arising between persons engaged together in the same identical service. as,
for instance, between brakemen of the same train, or two seamen of equal
rank in the same ship, are comparatively rare.  In a large majority of cases
there is some distinction, either in respect to grade of service, or in the nature
of their employments.  Courts, however, have been reluctant to recognize
these distinctions, unless the superiority of the person causing the injury was.
such as to put him rather in the category of principal than of agent, as, for
example, the superintendent of a factory or railway, and the employments
'were so far different that, although paid by the same master,· the two serv-
ants were brought no further in contact with each other than as if they had
been employed by different principals.  We think this case is indistinguish-
able in principle from Randall's Case, which was decided in 1883, and has
been accepted as a sound exposition of the law for over ten years, and that,
unless we are prepared to overrule that case, the third question certified must
be answered in the affirmative.  The authorities in favor of the proposition
there laid down are simply overwhelming."

In this court we have had a phase of the question now before
us, in the case of Railway Co. v. Clark, 6 C. C. A. 281, 57 Fed. 125.
There an engineer was injured by the failure of a telegraph operator
to signal to him that a train had passed less than 10 minutes in ad-
vance of him; and we held that where, as in that case, the telegraph
operator was acting merely as a station agent or switchman, to
·signal to the engineer facts within his own observation, he was,
under the principle of Randall's Case, a fellow servant of the en-
gineer.    We did not, however, decide in that case—because it was
not necessary—that the telegraph operator, in transmitting the
orders of the train dispatcher, was a fellow servant of the persons
to whom he communicated those orders; and to that extent the
Clark Case is not controlling authority here.    But, after giving
the question full consideration, we do not think that any distinc-
tion can be made between the case where a telegraph operator
'communicates facts to the engineer, within his own knowledge, and
·that where he transmits orders of the train dispatcher.    The ar-
gument in support of the distinction is this:    It is the admitted
·duty of the railroad company to prepare a complete system of
rules for the running of trains, applicable to ordinary conditions
and to extraordinary conditions, so far as they can be anticipated,
.adapted to secure safe transportation of employés and passengers.
This duty includes that of furnishing a general time-table, upon
which trains may safely run.    It is the further duty of the company
to promulgate the rules and time-table, and to see to it that they
are brought to the knowledge of their employés engaged in run-
;ning their trains.    Whenever the. time-table is disregarded, and

trains are run upon telegraphic orders, this is but the establishment of a temporary time-table by the company. The contention, therefore, is that the company has the same positive duty to see to it that its employés operating its trains receive notice of the temporary time-table as of the general time-table, and that the negligence of the telegraph operators in discharging this duty of the company is the negligence of the company, and the fellow-servant rule has no application. The link in this chain of argument that will not bear the strain of examination is the assumption that, because it is the absolute duty of the company to communicate to its employés its general time-table, it must have the same duty with respect to a change of time-table in an emergency. The duty of the company is to provide general time-tables and general rules, and rules for all possible emergencies, and to communicate them to its employés affected by them, because this is reasonable and possible. The circumstances are such, and the time within which the communication can be made is so ample, that the company can have no excuse for failing to make it. But an employé who enters the service of a railway company knows that the transmission of a temporary change in the time-table, occasioned by an emergency, and calling for immediate action, must be through telegraph operators and signalmen, who are stationed along the road, working with them, at the same time and place, for the immediate, common object of running trains; and therefore he must be held to assume the risk of negligence in those persons thus engaged with them in exactly the same work. The only obligation which the company can be held to, with respect to the communication of a sudden and temporary change in the running times of trains by telegraphic order, is that, so far as those who represent the company are concerned, all reasonable care shall be taken in transmitting notice of the temporary changes. Meeting exactly the same contention in Slater v. Jewett, supra, Chief Judge Folger, after fully conceding the master's duty to see and know that his general time-table is brought to the knowledge of his servants who are to square their actions to it, said:

"It is not true that, on an occasion like this, it is the duty of the master, or a part of his contract, to see to it, as with a personal sight and touch, that notice of a temporary and special interference with a general time-table comes to the intelligent apprehension of all those whom it is to govern in the running of approaching trains. It is utterly impracticable so to do, and a brakeman or a fireman on a train knows that it is, as well as any person connected with the business. He knows that trains will often and unexpectedly require to be stopped, and that such orders must, from the nature of the case, be given through servants skilled in receiving and transmitting them. If there is due care and diligence in choosing competent persons for that duty, a negligence by them in the performance of it is a risk of the employment that the coemployé takes when he enters the service. Such a variation, and the giving notice of it, is not like the supply of suitable machinery, or of competent and skilled fellow workmen. It is the act of an hour or of an instant, which, for any useful effect to be got from it must be done at the instant, and that, too, from a distance. * * * The reasonable rule in such case hath this extent, and no more, that he (the master) must first choose his agents with due care for their possession of skill and competency, and that then he must use the best means of communication,

according to prescribed general rules and regulations, devised from the best experience in such business; and it, among those means, is the service of a fellow servant competent for his place, his possible carelessness is a risk of the employment that his fellows take when entering into the service."

In several of the cases already cited to sustain the view that a train dispatcher is not a fellow servant of a conductor or engineer, a clear distinction is made between the telegraph operator and the train dispatcher, by which the former is placed in the category of all subordinate employés with the engineman and conductor, and is held to be a fellow servant of them. Such is the holding in Slater v. Jewett, 85 N. Y. 62, already referred to, and the propriety of it has been recognized in all subsequent New York cases, and distinctly approved in Sutherland v. Railroad Co., 125 N. Y. 737, better reported in 26 N. E. 609. The same distinction is recognized in Reiser v. Pennsylvania Co., 152 Pa. St. 38, 25 Atl. 175, and in McKaig v. Railroad Co., 42 Fed. 288. A different view, it is true, has been taken in Railroad Co. v. De Armond, 86 Tenn. 75, 5 S. W. 600, and in Madden v. Railroad Co., 28 W. Va. 610. But in these two states the different department theory prevails, and is the basis of the decision in each case. The different department exception to the fellow-servant rule, as we have seen, has been much limited by the supreme court of the United States in its last utterance upon the subject, and the authorities of West Virginia and Tennessee are therein expressly dissented from. In the case of Railroad Co. v. Charless, 2 C. C. A. 386, 51 Fed. 562, the circuit court of appeals of the Ninth circuit held that a telegraph operator, under the averments of the petition in that case, was not a fellow servant of a train employé injured by his negligence. This decision by the Ninth circuit has been considered by us, as may be seen by reference to Judge Barr's opinion in the Clark Case, already referred to. And only one sentence need be added to the comment there made. The court of the Ninth circuit relies on the decision of Lewis v. Seifert, 116 Pa. St. 628, 11 Atl. 514, to sustain its conclusion. That case only decided that the train dispatcher was not a fellow servant of the conductor or engineer injured by his negligence. The court below had also charged that the telegraph operator was a fellow servant. But it did not become necessary for the supreme court of Pennsylvania then to pass upon the correctness of the charge of the court on this point. Subsequently, however, in the case of Reiser v. Pennsylvania Co., 152 Pa. St. 38, 25 Atl. 175, this question arose squarely, and was decided as already stated, and contrary to the conclusion reached in the Charless Case.

In view of the decisions of the supreme court, in view of the ruling of this court in the Clark Case, and because of the considerations already stated, in our judgment the telegraph operator was the fellow servant, both at common law and under the statute, of the engineer Camp. And therefore the instruction of the court to the jury upon this subject was erroneous. The judgment must therefore be reversed, with instructions to order a new trial.