## FRED C. TILLSON

### *vs.*

## MAINE CENTRAL RAILROAD COMPANY & TRUSTEE.

### Somerset.    Opinion May 3, 1907.

*Master and Servant.   Negligence.   Fellow Servant.   Semaphore.   Danger Signals. "Law of Light."*

It is the duty of a railroad company, with respect both to the original construction and subsequent maintenance of a semaphore, to exercise due care to have such a permanent adjustment of it that when the lantern is kept in suitable working order, and properly set by the operator, it will display the correct signal to the engineer of an approaching train.

But when a locomotive fireman is injured by a collision between his engine and another, and such collision is caused by the negligence of the switch-tender in failing seasonably to change the semaphore signal from green to . red, or by a want of due vigilance and attention on the part of the engineer of his train in failing to observe the red light, if seasonably displayed, it must in each instance be deemed the result of the negligence of a fellow servant and the railroad company is not liable for the fireman's injury.

In an action by a locomotive fireman against a railroad company to recover damages for an injury received in a collision alleged to have resulted from the failure of the defendant company to locate a semaphore in a suitable place and adjust it at a proper angle, it appeared in evidence that the semaphore was permanently set at such an angle that the signal light thrown down the road could be distinctly seen at a distance of 1350 feet from the semaphore by the engineer of an approaching train, that the light would remain in full view for a distance of about 650 feet; that the view was then obstructed by the forward portion of the engine running on an ascending grade for a distance of 350 feet when the signal was again plainly visible for the remaining distance of about 350 feet. It also appeared that the rays of light emitted through the double convex lens of the semaphore lantern were so converged that the angle of refraction was less than fifteen degrees from a parallel line, and that without this lens the rays would have been dispersed at an angle of 60 degrees.

*Held:* That in view of the immutable law that light must always traverse space in direct lines, and of the fact that the red and green lights of the semaphore lantern are at all times precisely at right angles to each other,

it was impossible that the same light, adjusted at the same angle, should exhibit clear red to one observer, clear green to another and a confusion of red and green to a third, under precisely the same conditions, and that oral testimony in direct contravention of natural laws must be deemed incredible.

*Also held:* That if the semaphore was seasonably set red it must have sent down the line the danger signal which the engineer in the exercise of proper vigilance could not have failed to distinguish; that the collision resulted either from the engineer's failure of duty in this behalf, or from the failure of the semaphore tender to change the signal from green to red until a moment before the collision when it was too late for the engineer to stop the train in season to prevent it, and that in either event the grevious injury to the plaintiff was caused by the negligence of a fellow servant and the liability of the defendant company is not established.

On motion and exceptions by defendant. Exceptions waived. Motion sustained.

Action on the case to recover damages for severe personal injuries sustained by the plaintiff who was a fireman on one of the defendant's engines, and caused by the alleged negligence of the defendant.

The negligence claimed was that a semaphore in the Waterville yard of the defendant was permanently so set, and its lantern and lights were permanently arranged at such an angle with the track to the west down which its lights were intended to be thrown, as not to show, to trains approaching, the true light intended to be shown, but rather the opposite color, or else such a confusion of both colors that the engineer and fireman on the approaching train could not determine which signal was intended, whether that for danger or for safety, and could not, therefore, determine their duty either to stop or to proceed.

Tried at the March term, 1906, of the Supreme Judicial Court, Somerset County. Plea, the general issue. Verdict for plaintiff for $25,208. The defendant then filed a general motion to have the verdict set aside. The defendant also took exceptions to certain "rulings and statements of the issue and the law" made by the presiding Justice at the trial, but at the argument before the Law Court these exceptions were waived.

The case appears in the opinion.

*Forrest Goodwin,* for plaintiff.

*Orville Dewey Baker and Charles F. Johnson,* for defendant.

SITTING: EMERY, C. J., WHITEHOUSE, POWERS, PEABODY, SPEAR, JJ.

WHITEHOUSE, J. The plaintiff, obtained a verdict of $25,208 for injuries received by him February 13, 1904, in a collision at the Waterville yard between the defendant's engine No. 66 and freight train No. 41 on which the plaintiff was fireman. The case comes to this court on the defendant's motion to set aside this verdict as against the evidence. The exceptions taken at the trial term were waived before argument at the Law Court.

It is alleged in the plaintiff's declaration that "the said defendant had erected, and then and there operated and maintained a semaphore at the Front Street crossing, so called, in said Waterville; that said semaphore consisted of a mast or pole upon the top of which was a lantern with four lights, two sides of which, opposite each other, showed red lights, and the other two opposite each other, showed green lights; that the red lights indicated danger, and the green light that the track was clear; that said defendant issued orders to its servants that all trains approaching the Waterville station, via Augusta, should be governed by the semaphore, at the Front Street crossing, meaning that if the red light was displayed by said semaphore, that the train should stop and not run by it; that said defendant, in the location, erection and operation of said semaphore, did not use due care and reasonable prudence, but carelessly and negligently so located and maintained said semaphore, that when set for danger, it would show to the approaching engineer, a green light, or both red and green, so that the engineer would be deceived, as to the light from the semaphore, until he was so near to the same, that he could not, with reasonable care, stop the train before it run by said semaphore; that all of this was known to the defendant, or by the exercise of reasonable care, ought to have been known."

The plaintiff further avers that on the evening of February 13, 1904, the defendant "ordered engine No. 66 to stand on the main track between the Front Street semaphore and the station and ordered the semaphore to be set for danger so that train No. 41 could be stopped, and the plaintiff says that owing to the defective and danger-

ous location and arrangement of said semaphore, although it was properly set for danger, it showed otherwise to the engineer of train No. 41 as he approached the station," by reason whereof the train was allowed to run past the semaphore and collided with engine No. 66, causing the severe injuries to the plaintiff of which he complains.

On the other hand the defendant contended "that the semaphore and its lights had been in the same permanent position as at the time of accident for about twenty-four years; that they were properly set, both as to location and as to angle with the track, and, during all this period, were so set and directed as to give true, and not false or conflicting signals, to all approaching trains; that during these twenty-four years there had never been any difficulty, complaint or accident in their operation; and that if they were operated or were set improperly or defectively at the time of the accident, it was without notice or knowledge on the defendant's part, and, if such defect existed at all, it was due to the temporary negligence of some fellow servant with the plaintiff, for which the defendant was not legally responsible."

It is a matter of common knowledge that the semaphore is a mechanical device for displaying signals by means of which information is conveyed to a distant point. The etymological definition of the word is "sign bearer." The railroad semaphore consists of a mast twenty-five feet or more in height surrounded by a movable platform with an iron rod to which is secured a lantern with convex lenses on four sides; on two opposite sides the glass is red and on the other two opposite sides it is green. This lantern is used for the night signal, while a board target or arm attached to the same platform, is used for the day signal. Under the defendant's rules the red light exhibited by the lantern at night indicates danger, and the green light indicates safety. The horizontal position of the board target or arm is the day signal for danger and a vertical position of it is the signal for safety. A cable is stretched from the semaphore to the station of the watchman or semaphore tender, and the lantern and target are both operated by means of a windlass and lever.

The semaphore in question in this case was erected in July, 1880, nearly twenty-four years prior to the accident. It was located 103

feet from the easterly end of the Front Street crossing at Waterville and about 16 feet from the south rail of the railway track. It was operated by the switch-tender at College Avenue crossing who has a "shanty" west of the crossing and only a few feet from the rails. In order to set the semaphore to show the green light indicating safety the cable was pulled in over the windlass by means of a lever and this was secured by means of a pawl. But when it was necessary to change the lantern from green, the signal for safety, to red, the signal for danger, it was only necessary to kick off the pawl, and the counterweight at the semaphore automatically turned the lantern one quarter of the distance around and changed the light from green to red.

The defendant's rule pertaining to the Waterville station prescribes that "eastward trains via Augusta will be governed by the semaphore signal near Front Street." According to other rules of the company "the semaphore must always be set to hold out trains while any train is occupying the main line at the station or in the yard, and an engine or train east of the Front Street semaphore was allowed to come down as far as the semaphore, and incoming trains from the west were allowed to come up as far as the semaphore."

Thus it is manifest that the correct location and adjustment of this Front Street semaphore, when erected, and its efficient management thereafter, became of vital importance as an aid to the defendant in the safe transportations of both passengers and freight over its road.

It is conceded that on the evening of the accident the exigency existing at the time the plaintiff's train was approaching Waterville from the west, called for the display of the red light, as the signal for danger; and it is not in controversy that if the collision was caused solely by the negligence of the switch-tender in failing seasonably to change the semaphore signal from green to red, or by a want of due vigilance and attention on the part of the engineer of the train in failing to observe the red light, if seasonably displayed, it would in each instance be the result of the negligence of a fellow servant and the defendant company would not be liable for the unfortunate consequences to the plaintiff.

But in accordance with the averments in his declaration the plaintiff contended at the trial and now contends in argument that the

semaphore was properly set red by the operator but by reason of the location of the semaphore on a curve of the railroad track and the improper angle at which it was placed with reference to the track directly in front of it, it gave false and conflicting signals down the line so that when set for red it was seen green by the engineer of the plaintiff's approaching train.   Thus the principal question at issue between the parties related to the angle at which the semaphore was permanently adjusted and pointed with reference to the westward track which it was designed to protect.   With respect both to the original construction and the subsequent maintenance of the semaphore, the defendant was bound to exercise due care to have such a permanent adjustment of it and that when the lantern was kept in suitable working order and properly set by the operator, it would send a true and not a false message down the line.   But whether or not the lantern was so set at the time of the collision that it deceived the engineer upon the plaintiff's train, is not the conclusive test of the defendant's liability, for the reason already suggested that such a condition might have been occasioned by the negligence of a fellow servant.

The semaphore mast was located on a curve of the railroad track east of Front Street crossing, but it satisfactorily appears from the evidence that when the lantern was set at the angle claimed by the witnesses for the plaintiff, as well as at the angle claimed by the defendant, the signal light thrown down the line of the road could be distinctly seen at a distance of 1350 feet from the semaphore by the engineer of a train approaching at a rate of speed at which the plaintiff's train was approaching on the evening in question; that the light would remain in full view for a distance of about 650 feet; that the view was then obstructed by the forward portion of the engine running on an ascending grade, for a distance of 350 feet, when the signal is again plainly visible for the remaining distance of about 350 feet.

The curvature of the railroad track at the point in question west of Front Street and the direction in which the light would be thrown if the semaphore (A) was properly set to give signals to an

approaching train at a point (B) 1350 feet distant, may be illustrated by a simple diagram as follows:

B ————————————————————————————————————A

In support of his contention that the lantern was permanently set at such an angle with the track that it either showed the opposite color from that intended or a confusion of colors that was no signal at all, the plaintiff failed to produce any evidence tending directly to show that prior to the accident any change whatever had ever been made either in the location of the semaphore or the angle at which the lantern was originally fixed upon the mast, or to show any defect whatever in any of the appliances or mechanism of the semaphore. He failed to produce any direct evidence that when the pawl was kicked off and the counterweight released, the lantern was not invariably turned one quarter of the distance around, automatically, and thrown exactly into place so as to display a red light. For aught that appeared in direct evidence on the night of the accident the semaphore was permanently set at the same angle as when erected and was accurately performing its office as a true sign-bearer, as it had done during all of the twenty-four years of its existence prior to that time. All the witnesses who might be expected to have some cognizance of the matter, whether called by the plaintiff or the defendant testified that never to their knowledge had any complaint ever been made either to or by any officer or employe of the company that this semaphore was not properly located, having regard to its efficiency, or that it was not placed at a suitable angle with reference to the track, or that there was any defect or want of reliability in the action of the lantern, if properly operated, with respect to the direction in which the signal lights were thrown down the track. The only complaint in regard to its location was heard when the Yankee siding was extended to a point west of College Avenue. It was then stated that under some circumstances switch engines might extend so far westerly that it would be necessary to move the sema-

phore.　The relocation thus suggested had no reference whatever to the angle at which the semaphore was erected, or to the efficiency of its action.

But the plaintiff sought to prove by the effect of its action in transmitting the signals down the track, that the semaphore was neither in a suitable location nor set at a proper angle.　In support of the proposition thirteen witnesses in all were called by the plaintiff of whom six were experienced engineers.　Six of the thirteen testify in substance that at all points west of the curve when the light was visible, it showed such a mixture of red and green, that it was not practicable to distinguish the signal intended.　Four of the witnesses testify that when set for red it showed green down the line, while three of the plaintiff's witnesses, including Horeyseck, who was the engineer on the plaintiff's train No. 41 at the time of the accident, testify that when set red it always sent a red line down the line and gave the true signal.

Mr. Baxter, the conductor on the plaintiff's train No. 41, who had been in the employ of the company for twenty-nine years, testifies that he "always considered" the lights "changeable from different points," that it would "show part red and part green at one point and farther up would show red if set for danger."　But he admits that he never made any complaint in regard to it, that he never knew the semaphore to fail to stop a train when it was set for the danger signal, and that he never heard of any accident resulting from a want of reliability in the semaphore.　On cross examination, in answer to an inquiry respecting statements alleged to have been made by him a few days after the accident different from those made by him on the stand, the witness made this extraordinary statement.　"You know in cases like that, under the existing laws of the State of Maine for fellow protection, we sometimes tell things for the best of the men concerned.　They might be suspended or laid off for it."　The testimony of this witness is so discredited by this remarkable answer that it cannot be deemed worthy of consideration as a medium of proof.

On the other hand, in addition to the direct evidence respecting the angle at which the semaphore was erected, as given by those who constructed and inspected it, fifteen witnesses were called by the

defendant to give evidence in regard to its effect in transmitting signals down the line. Of these eight were experienced engineers and seven were disinterested observers who had made actual tests under conditions satisfactorily shown to be in effect identical with those existing at the time of the collision. They all testify that when the lantern was set red, it uniformly showed a red light at all points down the track west of the curve, not only when set parallel with the rails opposite as claimed by the plaintiff, but also when set at a much greater angle and one more favorable for the plaintiff's contention.

An apparently irreconcilable conflict is thus disclosed in the voluminous testimony upon this point. But whatever variations there may appear to be in the testimony of witnesses who saw the same light set at the same angle and shedding its light under the same conditions, there are immutable laws of physical science, that cannot be disturbed by human testimony. Light from whatever source emanating must always traverse unobstructed space in direct lines. And according to familiar principles in optics, rays of light falling upon a convex lens are converged into a narrow and intense beam. In this case the evidence is unquestioned that the rays of light emitted through the double convex lens of the semaphore lantern were so converged that the angle of refraction was less than 15 degrees from a parallel line, whereas without this lens the rays would have been dispersed at an angle of about 60 degrees. Hence it would be impossible that the same light, adjusted at the same angle, should exhibit clear red to one observer, clear green to another and a mixture of red and green to a third, under precisely the same conditions. Testimony given in direct contravention of physical laws is necessarily deemed incredible.

But the defendant company also introduced direct evidence in regard to the angle at which the semaphore was in fact erected with relation to the track. The superintendent of bridges and buildings who had charge of the original construction of the semaphore in 1880, and set the lantern upon the mast, testifies that while he has no record or independent memory of the precise angle at which it was adjusted, he knows that it was set in such a manner as to accomplish

the purpose for which it was erected and throw the light down the line, and that with reference to the track it was set "as nearly parallel as you could get it, cutting the curve a little." Mr. Rogers, the carpenter who had been specially charged for eight years with the duty of looking after semaphores, testifies that he had inspected this semaphore several times before the accident ; that he tested it by climbing to the top of the mast and sighting down the track and then going down the track and sighting back to the lantern, and that he always found it "right," a term which he explains by adding that "it pointed down where he thought the engineer would first see the light." Mr. Rogers also states that five days after the accident he made a thorough examination of the semaphore, testing it in the same manner as before, and found that no change had been made either in its location or the direction in which the lantern threw 'its light.

The two signal tenders also testify that they had occasion to go to the top of the mast each day every alternate week and noticed the direction in which the lantern pointed. They both state that it was so directed as to throw its light down the straight track cutting the curve a little. Engineer Haines testifies that his train was stopped by the danger signal of this semaphore in 1902 or 1903, and that the lantern was properly set at an angle to throw the light down the track. Mr. Buck who lived in the house just westerly of Front Street crossing, states that when the semaphore was erected, he first saw the green light of the lantern through the window of his sleeping room, and thought it was a new star, and that from that time to the time of the accident, whether set red or green the light always shone directly into the window of that sleeping room. It appears from the plan and other evidence in the case that a straight line from the semaphore to the Buck house, would be substantially parallel with the straight line of track below the curve and not with the rails of the curve opposite the semaphore.

In view of this evidence and of the fact that the obvious and conceded purpose of the semaphore was to safeguard the trains approaching from the west, it is insisted in behalf of the defense that it is wholly improbable and inconceivable that the semaphore was ever

adjusted at any other angle than that which would cause the light to be thrown directly down the straight line of track to the point where it was first visible.

But it is only contended by the plaintiff at most that the semaphore was permanently set at an angle parallel with the rails at a point on the curve of the track opposite the semaphore itself. This is the claim supported by all of the plaintiff's witnesses that testify upon the point, with the exception of Nelson who was acting as semaphore tender at the time of the accident, and his admissions on cross examination clearly show that the lantern could not have been pointed as claimed by him.

That the lantern must have been set parallel with the rails of the curve opposite the semaphore according to the testimony of the plaintiff's witnesses, and could not have been placed at any greater angle is further shown by the uniform testimony of all of his witnesses that the light shown full in front after the train approaching from the west entered upon the curve west of the street crossing.

For the purpose of demonstrating that it would be a physical impossibility for a semaphore lantern thus set parallel with the track opposite and properly operated, to send down the track a signal the reverse of that intended or an indistinguishable mixture of both red and green signals, numerous tests appear to have been made with the lantern of the semaphore set at several different angles. Surveyor Buswell and four other disinterested witnesses made their experiments during the trial with the same lantern and the same locomotive engine in use at the time of the accident. Surveyor Buswell made his tests in the presence of the locomotive engineer who ran the engine when the tests were made. The identical lantern was also used in his experiments, and the engine though not the same, was in all essential respects equivalent to it. It is true that the old semaphore had been removed, for reasons already suggested which had no connection with its efficiency, and a new one had been erected much farther west, but the hole where the old one stood was plainly visible, and the semaphore used in making the tests appears to have been set in substantially the same place.

The value of these tests is sharply questioned by the learned counsel for the plaintiff on the ground that the conditions existing at the time of the accident are not shown to have been in all respects exactly reproduced at the time of the tests; but the facts show that in all essential particulars, the conditions were so nearly identical that the results of these experiments become important evidence tending to show how the light was thrown down the track with the semaphore placed at different angles, including that claimed by the plaintiff. It is unnecessary to review all of these experiments in detail. It is sufficient to state that tests made when the lantern was set at the angle claimed by the plaintiff as well as at the angle claimed by the defendant, confirm the testimony of the principal witnesses for the defendant who observed the actual working of the old semaphore. They testify that the light was first seen at a point about 1350 feet west of the semaphore, that it continued to be plainly visible for a distance of about 650 feet, when the light was obscured by the front part of the engine for about 350 feet; and that from this point to the semaphore, the view was unobstructed and the light plainly visible. They also state that under each of the tests whenever the light was visible at all, it was distinctly one color, a uniform red when set for red and green when set for green. The improbability that the lights could be deflected to the extent involved in the plaintiff's contention or that there would be such a frequent and equal mixture of the two lights down the track, is strengthened by the fact which should not be forgotten that the red and green lights of the semaphore lantern are at all times precisely at right angles each being 90 degrees distant from the other.

All of this evidence must be considered in connection with the fact that for nearly twenty-four years following its erection this semaphore effectually accomplished the purpose for which it was designed, by protecting all of the many thousands of trains that came into the Waterville yard, and that no complaint was ever heard during all of that time, that its signals did not convey the information desired. The defendant confidently asserts that the evidence as a whole, fails to show that the accident was caused by any want of ordinary care on the part of the defendant, with respect to the permanent location,

construction or angle of the semaphore light, but that it was the result either of a failure on the part of the tender to set the red light in due season, or a want of proper vigilance on the part of the engineer in observing the signal.

With respect to the occurrences on the evening of the accident, Horeyseck, the engineer of the plaintiff's train No. 41, who was charged with the responsible duty of carefully observing the signals, testifies emphatically as a witness for the plaintiff, that he was not deceived in the color of the signal. He insisted that he saw it green and that it was green when it was first visible a quarter of a mile distant, and that it continued green until after they were up around the curve. "It was green then after they shouted and called out that there was something on the track." He also testifies to the significant fact that the next moment after the accident he asked Mr. Nelson, who as a substitute was acting as semaphore tender that night "why he didn't have his board set," "board" being the railroad term for semaphore. Nelson admits this in his deposition. He says Horeyseck "claimed that the semaphore showed green. I claimed that it showed red. He claimed that the board was tipped off after he ran into Mr. Marquis. He claimed that the lights were changed after the collision with the Marquis engine."

This suggestion of a sudden change of color appears to have been adopted by the plaintiff himself in the testimony which he gave before the stenographer Haggerty immediately after the accident. According to Haggerty's report the plaintiff then said " After we stopped it showed red, but when we came up the hill I could have sworn by all that is good and holy that it was green." Head-brakeman Stinson, who was on the cab with the plaintiff and the engineer also states that the light was " unmistakably green down below, but just before the collision he looked and saw that the semaphore light was then red."

On the other hand, Nelson testifies positively in his deposition that immediately after the Marquis engine went onto the main line east of the crossing, he tipped the semaphore to the red, that it remained red until the plaintiff's train arrived and was red at the time of the collision. In answer to an inquiry as to his first knowledge of the

accident, he says: "The drug clerk said there was a headlight going round the curve. I jumped up, out through the door; when I got onto the platform they met."

It is undoubtedly true that this and much other evidence for the plaintiff tends strongly to show that the semaphore was properly and seasonably set red, and if so, the proof is convincing that it must have displayed the danger signal down the line which the engineer in the exercise of proper vigilance could not have failed to distinguish. But there is much in the evidence to warrant the belief that the signal was thoughtlessly permitted by the semaphore tender to remain green until the headlight of the engine and the shouts of the men warned him of the danger, when he "jumped out through the door" upon the platform of the shanty and kicked off the lever; then the counterweight instantly swung the lantern to red only a moment before the collision.

From all the evidence now presented the conclusion is therefore irresistible that one of these incidents furnishes the correct solution of the mystery. In either event the grievous injury to the plaintiff appears to have been caused by a want of due care on the part of a fellow servant, and the liability of the defendant company is not established.

It is accordingly the opinion of the court that the entry must be,

*Motion sustained.*
*Verdict set aside.*
*New trial granted.*