MARY BUTEAU *vs.* N. Y., N. H. & H. R. R. Co.

JULY 12, 1913.

PRESENT:   Johnson, C. J., Parkhurst, Sweetland, and Vincent, JJ.

*(1)   Negligence.   Proximate Cause.*

A towerman in the north tower of a "block" violated a rule of the railroad in permitting more than one train to enter the "block" at the same time. He notified the south towerman that both trains were in the "block" and set his signal at "danger" and this danger signal could not be changed until its mechanism was unlocked by the south towerman.   One of the trains passed out of the "block" and without waiting for the second to do so, the south towerman unlocked the danger signal at the north tower.   The north towerman then placed his signal at "safety" and the train upon which deceased was engineer entered the "block" and collided with the second train.

*Held*, that the want of care of the north towerman was not the proximate cause of the accident, which was the negligence of the south towerman in unlocking the danger signal before both trains passed out of the "block."

*Held*, further, that the negligence of the two towermen was not only not concurrent in time, but also the setting of the danger signal intervened, which prevented any evil consequences from the wrongful act of the north towerman until the new distinct wrongful act of the south towerman also intervening became the immediate cause of the injury.

*(2)   Master and Servant.   Negligence.   Vice-Principal.   Fellow Servant.*

A towerman whose duty it is to set the signals and operate the mechanism under his control for the purpose of giving notice to trainmen operating trains within and near the "block" where he is employed, is a fellow servant of an engineer operating a train through the "block."

*(3)   Master and Servant.   Negligence.   Vice-Principal.   Fellow Servant.*

A towerman whose duty it is to set the signals and operate the mechanism under his control for the purpose of giving notice to trainmen operating trains within and near the "block" where he is employed comes within the class of switch tenders, signal men, telegraph operators, station agents and

others, who are held to be fellow servants of the men employed upon the train whose movements they assist, rather than within the class of train dispatchers who in arranging for the running of trains over a railroad system are held to be performing the non-delegable duties of the master.

TRESPASS ON THE CASE for negligence. Heard on exceptions of plaintiff and overruled.

SWEETLAND, J. This is an action of trespass on the case for negligence brought to recover damages for the death of the plaintiff's husband, George L. Buteau. The case was tried before a justice of the Superior Court sitting with a jury. Upon the conclusion of the plaintiff's evidence said justice granted the defendant's motion for a nonsuit. The case is before us upon the plaintiff.'s exceptions to certain rulings of said justice made during said trial upon the admission and rejection of testimony and to the granting of a nonsuit.

The plaintiff's husband was an engineer in the employ of the defendant. At the time of the accident he was running his train on time towards Providence upon the southbound track of the defendant in the "block," so-called, which is bounded by the Northup avenue signal tower on the north and a tower near the Orms street bridge, in the city of Providence, on the south. In this so-called "block" the defendant at that time maintained what is know as the "Manual Block System of Signals" controlled by signalmen or towermen, located in the tower at either end of said block. The following is probably for the purpose of this case a sufficient explanation of the nature, and method of operation, of said system of signals with reference to this block. This explanation of said method of operation differs somewhat from the statement of the same made by the defendant, but conforms to that given by the plaintiff and agrees with the essential features of the operation of said system deducible from the testimony so far as it relates to the question involved in these exceptions.

North of Northup avenue tower was a signal known as the "distant" signal, showing lights at night and controlled by the Northup avenue towerman. This signal was arranged to show a green light, meaning safety, or a yellow light,

meaning caution.    At the Northup avenue tower itself was
a signal known as the "home" signal.    This signal was
arranged to show a green light, meaning safety, and a red
light, meaning danger.    When the block in question was
clear, *i. e.*, containing no train and was safe to be entered by a
train approaching from the north, a green light was to be
displayed at the "distant" signal north of the Northup
avenue tower and an approaching train might proceed at
full speed toward the block; if, upon approaching the tower,
the "home" signal displayed a green light the train might
proceed and enter the block.    When, to a train approaching
from the north a yellow light was displayed at the "distant"
signal, the train should proceed with caution toward the
tower and if at the "home" signal a red light was displayed
the train must be stopped and remain until the signal was
changed from a red light to a green when the train might
proceed into the block.    One of the general rules of this
system was that more than one train should not be permitted
to be in the block at the same time.    When a train had been
allowed to enter the block from the north upon the south-
bound track the towerman at the north tower notified the
towerman at the south tower by telegraph or telephone, both
of which means of communication existed between said
towers, the "distant" signal north of the block was placed at
caution and the "home" signal at the north tower was
placed at danger.    When the "home" signal at the north
tower was so placed at danger the signal became locked and
could not be turned again to safety until the signal was
unlocked by a mechanism controlled by the towerman
at the south tower.    The towerman at the south tower
should not operate the mechanism to so unlock the
danger signal at the north tower until the train had
passed by the south tower out of the block, and the block
again became clear.    It is apparent that if these regu-
lations were strictly observed by the towermen a collision
between two trains within the block would be impossible.
The railroad track within this block contained a long curve

which made it impossible at certain points on the track for an engineer to see ahead along the track for any considerable distance. Under the rules of this signal system the word "train" means an engine alone or an engine attached to any number of cars of any kind. On the night when the plaintiff's husband was injured, shortly before his train was permitted to enter the block, the towerman at the north tower had set his "home" signal at safety, had allowed a switching engine to enter the block from the north and, without changing the "home" signal to danger, shortly afterwards and before the switching engine had passed out of the block, permitted an engine with a caboose attached to also enter the block. He notified the towerman at the south tower that both trains were in the block, the "distant" signal north of the block was placed at caution, the "home" signal at the north tower was placed at danger, and this danger signal could not be changed until its mechanism was unlocked by the towerman at the south tower. The switching engine passed out of the block, across switches near said south tower into a yard of the defendant by the side of the track and then, without waiting for the engine and caboose to also pass out of the block the south towerman unlocked the danger signal at the north tower. The north towerman was then justified in placing his "distant" and "home" signals at safety, which he did. The train of the defendant's husband, at that time approaching the block from the north, with the north "distant" and "home" signals at safety, entered the block at full speed and proceeding around a curve collided with said engine and caboose. The defendant's husband either jumped or was thrown from his engine and received injuries from which he died.

The case was tried upon the first, third and fifth counts of the declaration. The first count alleges that the defendant negligently employed an incompetent servant to operate the signals in question and that said servant by reason of his incompetency suffered and permitted the plaintiff's husband to operate his engine along the defendant's track without

proper notice and warning of the presence of said engine and caboose upon said track.    The third and fifth counts allege in differing form that the defendant was guilty of negligence in failing to give the plaintiff's husband notice and warning of the presence of an obstruction ahead of him upon the track on which he was operating his train.    The servant whose alleged incompetency is referred to in the first count is the north towerman and the incompetency claimed by the plaintiff is said towerman's lack of experience and his unfamiliarity with the rules and regulations of said Manual block system of signals.    The justice of the Superior Court in granting the motion for a nonsuit ruled properly that whatever might have been the competency of said north towerman, any want of care on his part arising from his incompetency, if it existed, was not the proximate cause of the accident.    This towerman apparently disregarded one of the regulations of the signal system by knowingly admitting the switching engine and the other engine and caboose to the block at the same time; but the direct evil consequences of that act so far as concerned the possibility of injury to persons or property on any other train approaching from the north terminated when the "home" signal at his tower was placed at danger.    As appears by the plaintiff's testimony the proximate cause of the accident was the negligence of the south towerman in unlocking the danger signal at the north tower before both the switching engine and the engine and caboose had passed out of the block.    The act of the north towerman in sending both the switching engine and the engine and caboose into the block at the same time only became injurious to the plaintiff's husband in consequence of the intervention of the distinct wrongful act of the south towerman in unlocking the danger signal operated at the north tower.    The plaintiff claims that the competency of the north towerman should have been submitted to the jury because it was his negligence due to his incompetency combined with the negligence of the south towerman which caused the accident.    But these two acts were not concur-

rent in time.    A considerable period of time had intervened and also, what is more important, an act, *i. e.*, the setting of the danger signal had intervened, which prevented any evil consequence from the north towerman's wrongful act until the new distinct wrongful act of the south towerman, also intervening, was the immediate cause of the injury. The act of the north towerman became too remote to be considered the proximate cause of the injury or as concurrent with the wrongful act of the south towerman in producing it.    The chain of causation, between the negligence of the north towerman in admitting the switching engine and the engine and caboose into the block at the same time and the injury to the plaintiff's husband, had been broken.

Having ruled that the testimony showed that the accident was caused by the independent wrongful act of the south towerman the justice further ruled that the plaintiff should not be allowed to recover as this towerman was a fellow servant of the plaintiff's husband.    This raises the important and vital question in the case:    Are the towermen in setting the signals and operating the mechanism under their control for the purpose of warning and giving notice to trainmen operating trains within and near the block acting as fellow servants of the trainmen or are they performing the non-delegable duties of the defendant?    The plaintiff (2) contends that the duties of the towermen correspond to those of train dispatchers.    The justice referred to these towermen as merely switchmen having duties and powers of the same kind though somewhat more extensive than those of ordinary switchmen.    The defendant claims that the acts of these servants of the defendant approximate those of switchmen setting switches and giving signals upon the ground, or of station telegraph operators and station agents transmitting the orders of train dispatchers or giving notice to trainmen, train conductors and engineers of the operation and movement of trains passing their station of the condition of the track with reference to trains and other obstructions beyond their station.

In cases where the question has been specifically raised, a train dispatcher has been uniformly held not to be a fellow servant of trainmen upon the trains which are controlled by his orders. This is plainly on the ground that it is a duty resting upon the railroad company to regulate the running of its trains; among other reasons, to protect its employees and provide them a safe place in which to perform their work. The master cannot be permitted to delegate this duty to an agent and escape liability for its negligent performance. In *Wallace* v. *Boston & Maine R. R. Co.*, 72 N. H. 504, the court held that a train dispatcher charged with the duty of directing the movement of trains over the defendant's railroad is not a fellow servant of a brakeman on one of the defendant's trains and said: "The arranging for the running of trains generally is especially a master's function. It requires the exercise of the master's authority and discretion; it differs from the act of a conductor in taking his particular train over the road as the act of the author of a business, in instituting and directing it, differs from the act of a servant in executing its detail. It is a supreme act as distinguished from a subordinate act." In *Louisville, &c. R. W. Co.* v. *Heck*, 151 Ind. 292, the court held that one of the highest duties which the defendant owed to its servant was to direct and regulate the running of trains in a complicated system of transportation and said: "And this was the duty and power that the appellant had delegated to its train dispatcher to do and perform in the name of its superintendent. Whether the failure properly to discharge this duty was the negligence of the train dispatcher or superintendent can make no difference because, in either case, it was a duty the master owed, and hence the failure and neglect was the master's failure and neglect, to the injury of its servant." Also, *Baltimore & O. R. Co.* v. *Camp*, 65 Fed. 952; *Lewis* v. *Seifert*, 116 Pa. St. 628; *Hankins* v. *N. Y. R. R. Co.*, 142 N. Y. 416; *Darrigan* v. *N. Y. & N. E. R. R. Co.*, 52 Conn. 285.

On the other hand, a switchman turning switches and signaling trains upon the ground has generally been regarded as a fellow servant of trainmen who have been injured as a result of his negligent performance of duty. Although upon his care depends the safety of the track as a place upon which the trains are to run and the trainmen to work, the switchman's acts have been regarded not as those of control over the trainmen, but as part of the detail of operating the particular train for which he places the switch or displays the signal and together with the trainman he is playing his part in the safe running of that train. *Parker* v. *N. Y. & N. E. R. R. Co.*, 18 R. I. 773. In the early case of *Farwell* v. *Boston & Worcester R. R. Co.*, 4 Met. 49, in holding that an engineer and a switchman were fellow servants, Chief Justice Shaw said: "They are appointed and employed by the same company to perform separate duties and service all tending to the accomplishment of one and the same purpose, that of safe and rapid transmission of the train."

There are many cases which deal with the nature of the relation between trainmen and telegraph operators or station agents communicating information as to the movement of trains to the train dispatcher to enable him to prepare his orders or communicating the orders of the train dispatcher to engineers and conductors on trains passing their station. These relations are somewhat analogous to those which existed between the defendant's husband and the towerman in the case at bar.    It has been said that it makes little difference to the nature of the relation whether the information which the operator and agent communicates is based upon their own investigation and knowledge or upon the investigation and knowledge of the train dispatcher, which he has telegraphed to them. Such operators and agents have generally been held to be fellow servants of a trainman injured by their neglect in performing their duties whether in giving information to the train dispatcher or in communicating his orders. In *Northern Pacific Ry. Co.* v. *Dixon*, 194 U. S. 338, the court held that the telegraph operator who had

negligently made an erroneous report to the train dispatcher of the movement of trains past his station was a fellow servant of a fireman on a train who was injured as a result of orders of the train dispatcher based upon said erroneous report.   Also, *Illinois Central R. Co.* v. *Bentz*, 99 Fed. 657. In *Price* v. *Detroit &c. Ry. Co.*, 145 U. S. 651, the Supreme Court affirmed the judgment of the circuit court and approved an instruction to the jury that the telegraph operator who had negligently failed to notify trainmen of the orders of the train dispatcher, made to prevent a collision with another train on the line, was the fellow servant of an engineer upon the train.   Also, *Baltimore & O. R. Co.* v. *Camp*, 65 Fed. 952; *McKaig* v. *R. R. Co.* 42 Fed. 288; *Oregon Short Line* v. *Frost*, 74 Fed. 965; *Dealey* v. *Phila. &c. Co.*, 4 Atl. 170.

There is another class of cases which pass upon the relation existing between members of a train crew and a telegraph operator or station agent whose duty it is, without orders from the train dispatcher, to give information directly or by means of signals to the engineer or conductor on a passing train.   Operators or agents so acting have in most cases been held to be fellow servants of the employees upon the train.   In *Baltimore & O. R. Co.* v. *Camp*, 65 Fed. 961, Mr. Justice Taft said, with reference to telegraph operators so acting:   "When there is no order but the telegraph operator conveys by signal to the engineer information as to the position of other trains or the condition of the track ahead, the operator is the mere register of the fact, a mere notifier, a mere giver of information upon which the engineer, under the rules of the company, at once knows his duty and acts accordingly."   In *Cincinnati &c. R. Co.* v. *Clark*, 57 Fed. 125, a telegraph operator at a way station, who, under the rules of the company, is required to put out proper signals for passing trains and thus provide that no train shall pass within ten minutes of another, is a fellow servant of a fireman upon a train injured in a collision caused by the operator's neglect of such duty.   In *Toner* v. *Chicago &c.*

*Ry.* 31 N. W. 104, it appeared that by the rules of the company station agents were held responsible for the safety of switches, and it was made their express duty to see that the main track was clear and unobstructed for the passage of trains. "They were required to be out at the station and know that everything was right when trains were passing." The court held that if the station agent was guilty of negligence, either in not preventing by some means, a freight car from going out onto the main track or in failing to discover that it was there in time to avoid a collision with a train, then his negligence was that of a fellow servant for which the company is not responsible to a brakeman on said train, who was injured through such negligence.

We find but few cases which consider the nature of the acts of towermen operating signal systems whose power and whose duties are exactly like those of the towermen in the case at bar. In *Pearsall* v. *N. Y. Cent. R. R. Co.*, 189 N. Y. 474, it was held that the operator who had charge of a switch and semaphore signal on defendant's track is a co-servant with an engineer of a train passing over said track who is injured by the neglect of said operator. In *Tillson* v. *Maine Central R. Co.* 102 Me. 463, the court, in speaking of the relation between a fireman on one of the defendant's trains and a switch-tender whose duty it was to set the light in a semaphore, said: "It is conceded that on the evening of the accident the exigency, existing at the time the plaintiff's train was approaching Waterville from the west, called for the display of the red light as the signal for danger, and it is not in controversy that if the collision was caused solely by the negligence of the switch-tender in failing to seasonably change the semaphore signal from green to red or by a want of due vigilance and attention on the part of the engineer of the train in failing to observe the red light if seasonably displayed. it would in each instance be the result of the negligence of a fellow servant and the defendant company would not be liable for the unfortunate consequences to the plaintiff." In *Stever* v. *Ann Arbor R. Co.*, 160 Mich. 207, the court held

that a towerman, in charge of the semaphore and inter-
locker at the crossing of two railroads, employed by the two
railroads, each paying half of his compensation, is a fellow
servant of an engineer of one of the railroads who is injured
by the negligence of such towerman. The court said: "In
our opinion the duties of the towermen are more analogous
to those of the local telegraph operator than to those of the
train dispatcher and the difference between them and a
crossing switchman operating upon the ground and turning
the switch light by hand or giving signals with a lantern is
one of degree and not of kind. The towerman therefore is
ordinarily a fellow servant of the engineer."

The plaintiff on this point has cited two cases from the
West Virginia reports which, if of sound reasoning, are
authorities which strongly support her contention. In
*Haney* v. *Pittsburgh &c. R. Co.*, 38 W. Va. 570, the court hold
that a section hand of the defendant riding upon a construc-
tion train in the course of his employment, is not a fellow
servant of a towerman by whose negligence the said section
hand is killed. This case also holds that the conductor
having control of his train is not a fellow servant of the
engineer upon the train. The latter would not be considered
the statement of a sound principle according to the decisions
of our State. The other West Virginia case cited by the
plaintiff is that of *Flannegan* v. *Chesapeke & O. Ry. Co.*,
40 W. Va. 436. In its opinion the court says: "In this
case the defendant, seeking to discharge its personal duty
and provide a safe track, and at the same time facilitate the
rapid movement of trains, established the signal station and
placed the operator in charge with full authority by means of
a code of signal orders equally as effective as any other kind
could possibly be, to control the running of all trains over
the block; and all trainmen of every train were under abso-
lute rule to watch for and obey her orders before they dare
enter upon the block. If she had been attentive to her
duties she must have known the block was occupied and
obstructed, and her knowledge was the knowledge of the

master; yet, in the face of that fact, she negligently gives the peremptory signal for the train to proceed. In what way could she possibly be deemed a fellow servant of the trainmen who are entirely at her command and who can neither influence nor control her independent action? She is as much the master of her section block as the master is of the whole road." This statement of absolute control of trains passing through the block by the woman telegraph operator was based entirely upon the following facts: The block in question was a tunnel and the opinion recites: "The trains were run through this tunnel by means of signals known as the 'block' signal, there being a telegraph station at either end of the tunnel in charge of an operator whose duty it was by signals to notify trains when to stop and when and at what rate to proceed. The operator at the west end gave the passenger train the wrong signal, being that for a clear track and allowed it to proceed at full speed when she should have stopped it." We think that upon these facts the court has made too strong a statement of the power and authority of the operator. It was the duty of the engineer, when notified by the operator that the track within the tunnel was not clear, to stop his train in accordance with ordinary prudence and the rules of the company, until the track became clear. When notified that the track was unoccupied he was to proceed through the tunnel. The operator cannot be said to represent the master to the extent of exercising control and authority over trains passing through the tunnel. She was simply assisting the engineer in the safe conduct of his train by notifying him of facts which, if she exercised care, would be within her knowledge. The engineer receiving such information was enabled to perform his duty more efficiently and in accordance with the rules of their common employer. We cannot accept the doctrine set out in *Flannegan* v. *Railroad Co.*

It is apparent that by the great weight of authority a train dispatcher in arranging for the running of trains throughout the whole or a division of a railroad system is

performing the non-delegable duty of the master and that switch-tenders, signal men, telegraph operators, station agents and others, when attending to duties similar to those assigned to the towerman in the case at bar, are acting as fellow servants of the men employed upon the train whose movements they assist and, in a sense, direct, although they do not control.

(3)    This distinction is well defined and the reasoning upon which it is based becomes convincing if we consider, not the superficial aspect of the duties of these two general classes of servants, but the essential difference between the purpose and effect of their several activities.    The train dispatcher is attending to a part of the master's business as necessary for the safety of its servants working upon its trains as is the proper condition of its roadbed or its cars, and one of the chief ends and purposes of the train dispatcher's work is not only to provide for the expeditious moving of trains, but also to provide for the safety of the trains and of the human beings upon them.    As to the other class of servants, while the careful performance of their duty is essential to the safety of other employees, as is true of the service of nearly every servant employed in the operating department of a railroad, the direct purpose of their work is to assist, as a part of the executive detail, in the running of a particular train.

The plaintiff's husband cannot be said to have been acting under the direction and control of the towerman.    The towerman by reason of the instrumentalities which the defendant has placed in his control and by an observance of the regulations which the defendant has promulgated is able to have an exact knowledge of the condition of a portion of the defendant's track, if those instrumentalities and regulations are carefully used and observed.    By a system of signals provided by the defendant the towerman is able to communicate that knowledge to the other employees of the defendant, who are to act in accordance with the information so given by reason of the duty imposed upon them by the rules and regulations of the defendant.    By the use of this

system of signals the towerman does not become a vice-principal of the defendant regulating and controlling a part of the defendant's business or exercising power to control other employees of the defendant; but by thus attending to a part of the detail of the defendant's business he is giving to an engineer information and assistance for the more efficient performance of that engineer's duties. He is acting, not as a train dispatcher, but in the same manner as a switchman, a flagman, or a telegraph operator acts, to assist in the general scheme of the master's business by attending to a detail thereof.

We find no error in the ruling of the justice of the Superior Court granting the defendant's motion for a nonsuit and this exception to said ruling is overruled. The other exceptions of the plaintiff are immaterial and do not require consideration.

The case is remitted to the Superior Court for the entry of judgment for the defendant upon the nonsuit.

*John W. Hogan, Philip S. Knauer,* for plaintiff.

*Joseph C. Sweeney, Philip T. Gleason,* for defendant.