## CHARLESTON.

STATE *v.* ROBERT PRICE

Submitted October 23, 1923.    Decided October 30, 1923.

CRIMINAL LAW—*Conviction on Conflicting Evidence Not Disturbed, Unless Improper Motive of Jury Indicated; Conviction on Evidence Directly Conflicting With Physical Facts Will be Set Aside.*

A verdict of guilty in a criminal case based upon conflicting oral evidence will not be disturbed unless the evidence so clearly preponderates in favor of defendant's innocence as to clearly indicate passion, prejudice or other improper motive on the part of the jury; but where the oral evidence is conflicting and the evidence of the prosecution is in direct conflict with physical facts, well established and unquestioned by the state, and which physical facts impel the conclusion that defendant is not guilty beyond a reasonable doubt, such verdict will be set aside and a new trial awarded.

Error to Circuit Court, McDowell County.

Robert Price was convicted of murder in the second degree, and he brings error.

*Reversed, verdict set aside, and new trial awarded.*

*Cecil H. Riley, E. H. Harper and Harman & Harman,* for plaintiff in error.

*E. T. England, Attorney General, R. A. Blessing, Assistant Attorney General* and *Arthur G. Froe,* for the State.

LIVELY, JUDGE:

Upon a verdict of second degree murder defendant was sentenced to confinement in the penitentiary for five years, June 11, 1921; and he prosecutes this writ of error.

The only error relied upon in defendant's brief is the refusal of the court to set aside the verdict and award a new trial; and as a basis, it is asserted that the evidence is insufficient to sustain the verdict. This assignment impels a close examination of the evidence. A Hallowe'en party was in progress at the home of Julia Stevens, at Mayberry, McDowell county, on November 1, 1920. The deceased, David Hurt, was a brother of Julia Stevens, and was at the party. The homicide was committed between eleven and twelve o'clock that night. The evidence of Sam Brown is that de-

fendant, who was a deputy sheriff of McDowell county, and who seemed to be operating a taxi for hire that night, stopped his car in the public road in front of the Stevens house, about eleven o'clock; that he and David Hurt went out to the car, and in the car as a passenger was Ollie Gilbert, a school mistress who was invited by them to alight and attend the party then in progress. She told Sam Brown to pay her fare if he wanted her to get out, and he thereupon handed her $1.00, which she delivered to Price, and went into the house accompanied by Hurt and Brown. The Stevens house and also a number of other houses in a row and about fifty feet apart stood back from the road and was enclosed by a fence which extended to within thirty feet of the public road, which was on a fill at that place, and about four feet higher than the ground at the gate. Immediately in front of the gate the ground was practically level and of a width sufficient to let an ordinary wagon pass; from this level strip of land the ground gradually ascended until the county road was reached. The physical surroundings are important. When Ollie Gilbert left defendant's car she made some request that he take her back from the party. Brown says defendant drove his car away and in about five minutes returned in front of the house and began blowing his horn for Ollie Gilbert. He, Brown, and David Hurt, supposing it was a car which they had ordered for some of their guests, went out and found Price alone in the car, and that there was no other person present except Nebraska Gardner who had later followed them out of the house to the road. Brown informed Price that he had already paid Ollie Gilbert's fare, and that she would go back with him (Brown), whereupon Price replied that he was "looking for $5.00 out of this trip." Brown then asked him to give back the $1.00 which had already been paid, when defendant turned his light out, drew a pistol and threatened to kill them. Thereupon, Brown says, he and Hurt backed off the hill down to the gate, and just as they got to the gate Price began shooting at them, when he, Brown, ran into the house and Hurt ran along the path by the fence with his right side toward the road. Brown says five shots only were fired all by Price, after which Price got in his car and rapidly drove away. In this

statement he is corrobroated by Nebraska Gardner who
said he was near the car and heard the conversation, saw
Hurt and Brown back down to the gate and that then the
shooting began. The wife of Sam Brown testified that she
came out of the house while her husband and Hurt were
backing down from the road, and that Price began shooting
when they reached the gate. Brown and Gardner say they
did not have, nor did David Hurt have a pistol; and it ap-
pears that Hurt, who a few minutes afterwards was found
dying about thirty feet from the gate and near the fence,
had no weapon upon him; at least he had none when he was
brought into the house in the excitement and confusion and
was searched by one of the witnesses. Deceased was shot in
the left side, the ball entering under the shoulder blade and
ranging upward, the hole being apparently made by a 32
caliber ball. The state's witnesses say all of the shooting was
done by Price. Sam Brown and another state witness say
Price came back about daylight next morning in company with
Gillispie and Squire Donley, and on that occasion said he
had shot Hurt but didn't know what he had shot him for.
This is denied by Price and by Gillespie, both of whom say
no conversation whatever was had with these state witnesses
on the following morning; Gillespie testifying that he was
with Price in the car all the time while there.

The witnesses for defendant tell quite a different story. It
appears that when Price first went by the Stevens house about
eleven o'clock that night there were in the car with him
Gillespie, Barksdale, Dickenson, Hamilton and Ollie Gilbert.
He took Gillespie and Barksdale a short distance from the
Stevens house to a school house where a political speaking
was in progress, where Gillespie and Barksdale alighted. It
appears that Dickenson and Hamilton were in the car for
the purpose of being taken back to Northfork. The latter
two men were in the car on the rear seat when Ollie Gilbert
got out at the Stevens home and they heard what transpired
on that occasion. They and Price say the car staid there
several minutes on account of some engine trouble which Price
was attempting to adjust, and while they were there Sam
Brown and Hurt came out of the house to the car, Sam
Brown being evidently intoxicated, and began an altercation

with Price and demanded from him the $1.00 fare which had been paid by Brown for Ollie Gilbert; that Brown had a small pistol in his hand and threatened to use it; that Hurt had Brown by the arm insisting that he should have no trouble with Price who he said was an officer, and that Brown replied that he had as big a gun as any officer, but that Hurt succeeded in getting him down the declivity to the gate, when Brown began to fire his revolver; that the second shot struck the car in which they, Hamilton and Dickenson, sat and they both immediately got out of the car and laid behind it on the ground; that Price ran from his car to a Ford car which was standing near and began firing; that at the first shot by Brown at the gate David Hurt, who had hold of Brown and attempting to prevent him from shooting, broke loose from him and ran up by the fence; that Brown, after shooting several times, turned and ran into the house; that Price immediately came to them and said he was shot and that they should get away from there and they all got in the car and started away; that while they were starting some one came from behind the Stevens house and fired two shots at them as they went away. A short distance from the house they stopped and bound up Price's bleeding wound which was in the knee. They went on to Northfork. While there some one informed Price that Brown had been shot and that he was accused of doing the shooting. Next morning before daylight he took Squire Donley and Gillespie and went back to see what had happened. The evidence of Price is substantially the same as that of Dickenson and Hamilton. He says when the shooting began he was standing by his car and that the second shot struck the front part of his car making an indentation, and that he immediately fled to the Ford car a short distance away and began shooting at Brown at the gate. That Brown shot five times and that he shot five times, and that one of the shots from Brown's pistol wounded him in the knee. He exhibited the wound and the pantaloons through which the ball passed, to the jury. He is corroborated by Ollie Gilbert who says she saw Sam Brown and David Hurt standing at the gate when Brown began the firing, and that Sam's wife immediately ran out into the yard calling to her husband not to do that; that when Brown emptied

his revolver he came running into the house and fell over his wife who had reached the door, and there threw the empty cartridges out of his pistol. There seems to have been one light, a small electric light, at the porch of the Stevens house. No witness tells whether the night was dark or otherwise. There are other witnesses who heard the shooting and were in the near vicinity, but whose evidence is not important.

It will be seen that the oral evidence is irreconcilably in conflict. None of the witnesses on either side testify that Price ever left the public road, and they all agree that Hurt and Brown were standing at the gate at least thirty feet away when the firing began and were never closer. The state's witnesses say all of the shooting was done by Price and upon the slight provocation detailed by Brown and Gardner. Defendant's witnesses say the shooting was begun by Brown at the gate, after making threats against Price in the road, and that the fire was afterwards returned by Price when he reached the Ford automobile. Brown says he was not drinking; others, including Ollie Gilbert, who possibly danced with him, say he was intoxicated. Thus the conflict in the oral evidence is startling, and it may be said it was solved by the jury· in favor of the prosecution. Dr. Peters, who immediately attended the deceased after the shooting, and who was the first witness introduced by the state, stated that the shot was in the left side under the shoulder blade made by a 32 caliber ball; that it ranged upward and inward and that *the body was powder burned.* The revolver used by Price was a 41 caliber Colts, and one of the balls was found in a small tree which stood by the gate; and one of the state's witnesses said another ball had struck the house which was in the direction of where Hurt was found. This evidence of the ball in the neighbor's house is rather unconvincing. These physical facts militate very strongly against the case made by the state's witnesses. The location of the wound on the left side under the shoulder blade, that it ranged inward and upward, that it caused the death, and that the body was powder burned at the wound, was proved and vouched for by the state. Price, according to all who testified, was on an elevation of about four feet above the ground where Hurt was shot and was at least thirty feet from his antagonist at all times of

the shooting. The ball ranged upward after entering Hurt's body and was of small caliber. It may be that Hurt turned his left side at some part of his flight and that he bent over, thus accounting for the shot in the left side and the range of the ball; but the powder burns on the body irresistibly force the conclusion that the shot which killed him was fired at a very short distance away. The doctor who testified to the powder burns on the body was introduced by the state, and the prosecution is bound by his testimony. No witness attempted to contradict; and it is in evidence that white powder from a 32 caliber revolver will not burn over a distance of three inches, but that black powder would likely burn at a longer distance. It is not shown whether black or white powder was in the cartridges; at a distance of thirty feet there would be no powder burns. This is a physical fact well known; and of common knowledge among those who are conversant with the use of fire arms. The state in its brief makes no attempt to reconcile this physical fact with the oral evidence; while the evidence that Price was shot in the knee and that one of the balls struck the car may have been manufactured, (though not contradicted in any way), it seems to us that the powder burn on the body is a fact which could not be manufactured and which speaks louder than any of the interested witnesses. The state's witness, Dr. Peters, who said the orifice of the wound was made by a small caliber ball, (he judged a 32 caliber), might have been mistaken in his judgment in that regard, but he is not contradicted by any of the numerous witness who viewed the body. Unfortunately, the fatal ball was not extracted from the body and its caliber definitely determined.

What evidentiary weight shall be given to the undisputed physical fact of the powder burns around the wound? They tell with unmistakable force that the weapon which fired the shot was very near the body when it was fired. But it is argued that the jury has found that the state's witnesses who say all of the shooting was done by Price, had the province to declare that these witnesses were more credible than the admitted physical fact.

We are not unmindful of the well established rule that the jury is the sole judge of the weight of evidence; the

credibility of witnesses; and that its verdict in a criminal case based upon conflicting oral evidence will not be set aside unless the evidence in favor of defendant clearly indicates that the jury was influenced by passion, prejudice or other improper motive in arriving at the verdict. Many of our cases lay down these principles. White v. *Hoster Brewing Co.,* 51 W. Va. 259; *State* v. *Henry,* 51 W. Va. 283; *State* v. *Prater,* 52 W. Va. 164; *State* v. *Cook,* 81 W. Va. 686; *State* v. *McLaughlin,* 91 W. Va. 654. In considering the evidence on which the verdict is based where it is asserted that the evidence preponderates in favor of the losing party, the plaintiff in error occupies the position of a demurrant to the evidence, and the rule is to discard all of the evidence of the demurrant which is in conflict with that of the successful party in order to determine the question. The conflicting oral evidence of the demurrant is not considered. Yet, if the verdict is dependent upon the testimony of witnesses which is in flat contradiction of conceded physical facts in the case such evidence has little weight and is not permitted to override undisputed physical facts which demonstrate such evidence to be untrue. The courts very generally hold that such evidence flatly contradicted by undisputed physical facts is not sufficient to sustain a verdict. ''Testimony in conflict with conceded or undisputed facts cannot, in the nature of things be true, and hence cannot form any basis for a conflict upon which to rest a verdict.'' *N. & W. Ry. Co.* v. *Crowe,* 110 Va. 798. We said in *Owen* v. *Power Co.,* 78 W. Va. 596, that ''A verdict, supported by oral testimony which is wholly inconsistent with natural laws and physical facts, admitted to be true or established by uncontroverted evidence, showing such testimony to be false, should be set aside as being contrary to the weight of evidence.'' In that case a boy was seriously and permanently injured by electricity from a high voltage wire which had sagged between the poles supporting it to within seven or eight feet of the ground. The boy testified that as he walked under the wire out in the field the electricity jumped from the wire and injured him. No person witnessed the accident, and there was no verbal testimony to contradict the boy's

statement. It was shown, however, that in such cases the most serious results from the electric current are where it first strikes the body and where it leaves the body. The boy's hand and arm, which he intimated were hanging by his side, were so seriously burned and charred that the arm had to be amputated near the shoulder, and his feet where the electricity left the body were burned to such an extent that the toes had to be amputated and some of he bones removed; thus indicating that the hand and arm were nearest to the charged wire and caused the accident. The physical fact impelled the conclusion that the boy had been guilty of contributory negligence in tampering with the wire.

There are many cases where verdicts have been set aside under this rule, which seems to be based on common sense. In *Tillson* v. *Maine Central R. Co.*, 102 Me. 463, it was said that "Testimony given in direct contravention of physical laws is necessarily deemed incredible;" and in *Groth* v. *Thomann*, 110 Wis., 488, "When physical situations or matters of common knowledge point so certainly to the truth as to leave no room for a contrary determination, based on reason and common sense, such physical situation and reasonable probabilities are not affected by sworn testimony which in mere words, conflicts therewith." In *Wheelan* v. *Chicago R. Co.*, 85 Ia. 167, a tract repairer testified that a crowbar in his hands had been struck by an iron two inches wide and an inch thick which was attached to a train running twenty-five or thirty miles an hour and by reason of the impact the crowbar was thrown against his neck and body with such force as to break his jaw bone and arm; but it was shown that no mark whatever had been left upon the crowbar by the impact of the iron bar attached to the train, and the court said it was inconceivable how this could be done as testified to by the track repairer without leaving physical evidence of the claimed impact. In *Central Vermont R. Co.* v. *La Compagnie Ins. Co.*, 2 Que. Q. B. 450, it was claimed that a fire which burned a village was communicated to a building containing inflammable material standing near the railroad by sparks from a hot box on a railroad car which

had a short time before the fire passed through the village, and which hot box had been discovered after the train had gone a considerable distance beyond the village. The court said, from the very nature of the material which had been on fire, oil enclosed in an iron box, that no sparks could have been thrown off from it. Testimony which is directly contrary to accepted natural laws recognized and justified by long experience of men and the knowledge of every day life, should be ignored even without contradiction. *U. S.* v. *Post,* 128 Fed. Rep. 593; *Waters-Pierce Oil Co.* v. *Knisel,* 96 S. W. 342; *Tillson* v. *Maine Cen. R. Co.,* 67 Atl. 407. It has been decided by the Missouri supreme court that while a defendant in a criminal case has the right to testify to the intent with which he did an act, yet he is not entitled to an instruction upon his oral testimony where his intent is contradicted by the physical facts. *State* v. *Nelson,* 118 Mo. 124; *State* v. *Bryant,* 102 Mo. 24; *State* v. *Turlington,* 102 Mo. 642. The evidence from both the prosecution and defense firmly establishes the fact that Price at no time was closer than thirty feet from deceased when and after the shooting began. At the time of the first shooting when deceased and Brown were standing at the gate, the state's witnesses say Hurt was standing with his face toward Price, and immediately after the first shot he ran to the left, necessarily exposing his right side. It may be that the jury could conclude that Hurt's left side was toward Price when the shooting began or that it was afterwards exposed when he ran and that his body was in such position at the time of the fatal shot that it ranged upward and inward instead of downward which would be the supposed natural course. There are many eccentricities in the course pursued by a bullet after it strikes the body. Their freaks of direction are often unusual and bizarre. Col. Craig, an officer in the American Army at the battle of Cerro Gordo, was shot in the back and the ball pursued a circuitous route around his body and was removed from his breast; and it is authentically related that a sailor on the Mediterranean was shot in the neck and the ball followed the skin around his neck and was

found in the very orifice in which it entered. There is no conclusive probative value to be deduced from the course of a bullet after it strikes the body. If, however, the bullet which killed Hurt had been extracted and shown to be a 32 caliber ball and that the pistol used by Price shot a 41 caliber ball (one ball from which was cut out of the small tree standing at the gate and turned over to the prosecution, but which was not introduced in evidence) had been laid side by side before the jury, could a verdict stand against the defendant, which would necessitate a finding that it was the pistol in Price's hand from which the fatal bullet came? This observation is made to accentuate the value of undisputed physical facts.

When we consider, in addition to this undisputed physical fact, that there was abundant testimony that Brown was drunk, had a small pistol in his hand which he was threatening to use and that Hurt had hold of his arm attempting to prevent him from shooting; that the first shots were fired from the gate after which Hurt immediately ran to the left; that the orifice of the wound upon his body indicated that it was made by a 32 caliber ball; that Price used a 41 caliber pistol; that he was wounded in the knee which was bound up a short time after the shooting; that these incidents occurred in the night time and at a Hallowe'en party where there was supposed to be mint julep, we are inclined to the opinion that the preponderance of the evidence is for the defense. We recognize the rule that the evidence of uncontroverted physical facts must be sparingly used; but we conclude that the evidence taken all together has not established the guilt of the defendant with such degree of certainty that the verdict of the jury based thereon should stand.

The judgment of the lower court will be reversed, the verdict set aside and a new trial awarded.

*Reversed, verdict set aside, new trial awarded.*